## C. M. EMORY, et al. v. O. W. SWEAT, et al.

Eastern Section. October 22, 1927.

Petition for Certiorari denied by Supreme Court, April 14, 1928.

168

Powers & Thornburg, of Knoxville, for appellant.
Testerman & Burnett, of Knoxville, for appellee.

SNODGRASS, J.  The bill in this cause was filed by complainant as the original owner of, and still pecuniarily interested in, a subdivision or lot addition to the City of Knoxville, to enforce a building restriction claimed as generally obtaining in a certain section of said subdivision, and especially secured and evidenced by a deed made by himself and wife to one John M. Thornburg and wife on the 24th day of May, 1922, which property, it was alleged, had been conveyed by said Thornburg and wife with the same restrictions to Ray Jenkins, who it was alleged had conveyed the same to the defendant O. W. Sweat, omitting the restrictions, but referring in his deed to the conveyance under which he owned it, which contained notice of such restrictions.  It was alleged also that the defendant Sweat had notice of these restrictions otherwise.  The restrictions which thus appear in the chain of title of the defendants are as follows:

"To have and to hold the said premises to the said parties of the second part, their heirs, and assigns forever, subject, however, to the following conditions, limitations and restrictions, the breach or violation of any one or more which shall work a forfeiture of all payments made and expenses incurred and paid by said second parties or vendees, and it is agreed that the grantee, his heirs or assigns shall thereupon pay to the grantors, their heirs or assigns, all damages suffered therefrom, to be ascertained by arbitration or by legal proceedings. Said conditions, limitations and restrictions are as follows:

"1.  The within described premises, or any part thereof, shall never be sold, granted, devised or otherwise conveyed to, or leased, rented nor let to, or acquired or owned by any negro for a period of ninety-nine years from this date.

"2.  For a period of twenty years from date hereof, not more than one dwelling house to cost not less than $5000 shall

be erected on any of said lots, and said house shall be placed not less than thirty-five feet from the street line on which said lot fronts.

"3. The title in fee, to all streets, avenues, alleys, public places and parks is reserved in said C. M. Emory.

"4. No buildings or structures shall be built thereon, nor shall any use whatsoever of said premises be made which would be or create a nuisance, or in any way detract from the general character of a high class residential suburb.

"5. No business houses nor factories shall be built on said premises."

The restrictive clause which the bill alleges was violated is that numbered 2, providing that "for a period of twenty years from date hereof, not more than one dwelling house to cost not less than $5000 shall be erected on any of said lots, and said house shall be placed not less than thirty-five feet from the street line on which said lots front."

It is alleged that the said O. W. Sweat proceeded to construct a house upon said lot, (being lot No. 3 in block D of Emoriland, as shown by the map filed) which house it was alleged he knew under the provisions of the second condition, limitation and restriction in said deed heretofore copied, should at the time he constructed it cost not less than $5000, but that the said Sweat violated the said condition running with the land, and broke the same in this, that he constructed upon said lot a house which did cost less than $5000. After presenting some alleged evidence that it cost less, the bill continued:

"The complainant avers that said house should have been constructed at around $3500 (amended later to say $4000), and avers upon information and belief that said house did not cost as much as $5000, which was required by the said building restrictions. The complainant has had numerous objections to the construction of the house by the defendant Sweat, having warned him in advance of his construction of said house of the building restrictions, and having been assured by the defendant Sweat that he would comply with the provisions thereof; but the complainant avers that he failed to do so, and that the complainant is called upon by other grantees in said additions to require said Sweat to construct said house in accordance with the conditions, limitations and restrictions provided in the deed and the covenants running with the land."

Plaintiff insists that he is entitled to recover from said defendant all damages which complainant has suffered by reason of his breach of said condition and limitation, and further claims that he is entitled to a decree adjudicating that there is a forfeiture of all payments made and expenses incurred by said Sweat in the construc-

tion of said house, and of the title to said lot in the complainant's favor, or, in the alternative, that this Honorable Court by decree direct the said Sweat to perform the said conditions and restrictions by adding to and expending on said premises altogether the total sum of not less than $5000, as originally contracted and agreed upon, and as he is obligated to do as the owner of said lot.

In a paragraph the other complainant joins in the bill, as follows:

"Complainant George W. Henderson joins herein as the owner of property in the same block, and alleges that he is likewise damaged and entitled to the same relief as complainant Emory, by reason of his buying the property with the said restrictions."

They pray for a decree for all damages suffered by them on account of the defendant's violation of the building restrictions and limitations running with the land, that the title to the property be declared forfeited to the complainant, or in the alternative that defendant Sweat be directed by decree to expend, in addition to such sum as he has already expended, such amount as shall be required to make said dwelling house cost not less than $5000 as required by such conditions (it was alleged) running with the land, and for such other, further and general relief as the facts might show them entitled to.

The Bankers Trust Company was made a party as having loaned to Sweat the sum of $3250, secured by a mortgage on the lot, which it was insisted in no way stood in the way of the adjustment of complainant's rights. This defendant answered, admitting the loan, but insisting upon its superiority to any claim of complainants, and requiring proof as to all other matters, after admitting the allegation of the first section, and the allegation of the fourth section of the bill regarding the placing of the mortgage.

The defendant Sweat answered, admitting the allegations of the first and second sections of the bill and the allegation of the third as to the placement of the mortgage for $3250 to the Bankers Trust Company, but denied that he had breached any of the covenants, conditions, limitations or restrictions contained in the deed from C. M. Emory and wife to John M. Thornburg and wife, or in the deed from these last to Ray Jenkins, or as to the deed from the latter to himself, and especially claimed that he had not breached those certain conditions, limitations and restrictions of said deed and deeds as to the cost of the house he built upon said lot.

He denied that the evidence of the cost he submitted was the real cost, or that the statement had been padded, but insisted that, as he had represented, it was not a full statement, but that he wanted to give complainant a full opportunity to investigate every item and find out for himself what the cost of construction was. He insists he told complainant at the time the statement was given

him that there was other work and other things to be done on the house, and that it was made up from bills sent him from different materialmen, and that there might be some items in the bill that did not properly belong on the house; that there were possibly other items that did belong on the house which the bills did not include, and that defendant wanted complainant to investigate personally and be fully satisfied. It was denied that either of the complainants had suffered any damages by reason of the alleged breach, and especially that complainant George W. Henderson had suffered any damages, regarding whom it was insisted that the said Henderson purchased his property in said addition with the understanding that same was restricted according to the conditions, limitations and restrictions contained in his deed, and that he has no right in equity to enforce the restrictions against any grantee of premises in said addition, the covenant being a part of each and every deed to lots in the tract and the deeds showing that a uniform plan must be in existence, there being no contractual relation between the complainant Henderson and the defendant hereto, and there being no covenant in said deed that the restrictions should be for the benefit of all lots in the tract, same being merely for the benefit of the grantor, and that the complainant Henderson purchased his lot with the distinct understanding that said restrictions contained in other deeds did not inure to the benefit of parties purchasing lots therein, and that the restrictions contained in each deed are a separate and distinct contract with the grantor.

Proof was taken on the issues thus raised and the cause was heard before the Chancellor upon the whole record, who dismissed the bill, finding that the equities alleged were fully met and denied by the answer, and not sustained by the proof.

The court held that the building restrictions involved were valid and enforceable, but that defendant Sweat had substantially complied with the same.

It was adjudged that complainants and the securities on the prosecution bond pay the costs, for which execution was awarded.

Exception was taken by complainants to the decree, and an appeal therefrom to this court was prayed, granted and perfected. The assignments of error are:

"I. The learned Chancellor erred in holding that the defendant O. W. Sweat had substantially complied with the building restriction involved in this cause.

"II. The learned Chancellor erred in not holding that the defendant O. W. Sweat constructed a house that cost him only the sum of $4134.55.

"III. The learned Chancellor erred in not decreeing that defendant O. W. Sweat be required by mandatory injunction

by the court to expend upon said property the further sum of $798.70 in order to make the same comply with the building restriction, which the learned Chancellor held was valid and enforceable, and which the learned Chancellor held in this cause complainants were entitled to have enforced as the owners of equitable easements therein.

"IV. The learned Chancellor erred in not holding that the statement given by defendant O. W. Sweat as the cost of the house, Exhibit No. 3 to the deposition of C. M. Emory, wherein he fixed the cost of the house at $5000.77, was padded to the extent of $798.70, and in not finding as a fact that the actual cost of this house was $4134.55, and erred in finding as a fact that the dwelling house cost $4934.

"V. The learned Chancellor erred in finding as a fact that the defendant O. W. Sweat had not breached said covenant, and had substantially complied with the same.

"VI. The learned Chancellor erred in finding as a fact that this suit if successful would necessarily impose a penalty on the defendant, because under the prayer for general relief the court might have by mandatory injunction required the defendant to obey the provisions of the said covenant."

In a later assignment it was claimed that the Chancellor erred in not holding that the conditions and restrictions, to-wit, the restriction which provides that "for a period of twenty years from date hereof not more than one dwelling house to cost not less than $5000 shall be erected on any of said lots" was violated and breached, and in not further holding that this breach of said covenant and restriction should work a forfeiture of all payments made and expenses incurred by the vendee of said title, O. W. Sweat, the appellee here, and in not holding that said defendant should be required to pay to the complainant all damages suffered from said breach to be ascertained in this court and cause; appellant having been forced to bring this suit and incur considerable expense, and other properties having been damaged, as shown in this case, as a result of which all payments made by the appellee O. W. Sweat and all expenses incurred on said property and on account of the violation of the building restriction should be paid.

The Chancellor made and filed an additional finding of fact, as follows:

That the defendant O. W. Sweat is the owner of the house and lot described in the original bill in this case, he having purchased it under a deed containing a certain covenant pertaining to the restrictions of buildings thereon. Said covenant is correctly set out in the bill and established by the evidence.

"After his purchase of said lot the defendant constructed a dwelling thereon, and also a garage, the total cost of the two being $5110.25; the dwelling alone cost $4934.

"The court further finds that the defendant Sweat has not breached said covenant, but the cost of his dwelling alone was at a sum which amounted to a substantial compliance with said covenant or building restriction.

"The result of the suit, if successful, will impose a penalty on the defendant, and in order to make out a case of this character the proof should in the court be clear and convincing. I am of opinion that the proof of complainant does not meet that requirement."

There seems to be no issue but what the building restriction required the defendant to construct a house on the lot at a cost of not less than $5000, and, as a matter of fact, it is insisted that this restriction was complied with, and it is denied that the house cost less than $5000. However, the right of complainant Henderson to maintain any action on the agreement or covenant between complainant Emory and the defendant or his vendors, is challenged for a lack of privity. It is insisted that the easement in defendant's lot that was retained by complainant Emory never passed to complainant Henderson by the conveyance of Emory to him of a different lot, even though similar restrictions as to Henderson's lot were contained in the deed to him, or in any other way. In other words, that, even though it may have been Mr. Emory's verbally declared purpose to invest all that particular section of the subdivision with this easement, as mutual benefits to be mutually enjoyed, he simply has not done so; that to convey an easement which is an interest in land, will require a writing, with perhaps the single exception of the dedication of a way; that the deed to Henderson does not purport to vest him with any interest in defendant's lot, but simply conveys a different lot to him, reserving similar easements, and that therefore complainant Henderson has no status to require defendant to do anything, or expect him to answer personally to him for a breach of any contract with Emory, even though it might be a covenant running with defendant's lot; that complainant Henderson does not own defendant's lot or any interest therein, nor without a writing could he compel complainant Emory to transfer this easement which Emory holds in defendant's lot; that whatever may have been Henderson's contract culminating in his deed from Emory, which might have given him a claim against Emory for damages defendant owes him no primary obligation that would justify any action against him for damages or otherwise, such as are sought by complainant Henderson in his joint application with the said Emory.

We agree with this contention, and under the allegations of the bill do not think complainant Henderson has shown himself possessed of any status entitling him to any relief as against defendant Sweat. Defendant in accepting his deed to a lot affected by the easement retained to Emory never assumed or contracted personally to answer in damages any other lot owner for a breach of his contract not to place on his lot a house that cost less than $5000. .

We have been cited to no case in Tennessee supporting Mr. Henderson's claim for damages, or his independent right under the circumstances to maintain a case for specific performance or forfeiture. It is said in complainant's brief that ''according to the weight of authority where there is a building scheme covering an entire tract, with reference to which lots in the tract are sold and conveyed by deeds containing the restrictive covenants, the grantee of one lot may enforce these covenants against the grantee of another,'' and the case of Starck v. Foley, 209 Ky. 392, with other authorities is cited to sustain the text.

The case just mentioned was to enjoin the maintenance of a billboard for advertising purposes by one lot owner against another, both of whom claimed from a common ancestor. The restriction in the deed of the one under whom it was sought to maintain the advertising scheme was as follows:

''It is further agreed that this lot shall be used for residence purposes only, and any improvement located thereon shall be set back at least thirty-five feet from the west line of Third street.''

The maintenance of the billboard, found to be the conduct of a business, was enjoined, but the defense to the action was consent and laches, and no question seems to have been raised that the consent of another lot owner may not have been required, where it had not appeared by the deeds or some other writing that the reservation had been made in all of the deeds for the benefit of all; on the contrary, as to how the benefit appeared or could appear was not a question, as to which the court said:

''It is conceded that Mrs. Starck and Mrs. Foley trace their title to a common grantor, and that the common grantor, in conveying the two lots, inserted into the deeds for the benefit of the two lots, as well as for others held, the following covenant: (quoting the one mentioned above).

But if such right, without being legally possessed in some way by transfer, would exist in complainant Henderson, it must be under some idea of subrogation, which would carry no right to a personal judgment beyond what complainant Emory would be entitled to, as with reference to all other conveyances the statute of frauds would intervene to show no transferred right to Henderson

at the time of suit; and, having divested himself of interest in Henderson's lot, Emory would have no right to recover any damages incident to that lot. A parol trust in land cannot be created by a declaration. Therefore the reservation of the easement in defendant's lot had to complainant Emory cannot be regarded as for the benefit of and primarily enforceable by complainant Henderson as inuring to the benefit of his lot.

This holding does not mean that a general scheme may not be invested with a mutually charged easement operating for the benefit of every lot in a division or section, if the originator has actually by deed or writing transferred the easement he has retained in himself to every such lot in such form or manner that when each lot is transferred the easement in all previous lots is transferred, or if he has indicated in each deed that all retentions in himself are for the benefit of all the lots in the particular section, it will be sufficient, and it can be done in this way. But this important investiture is not effected by intendment, and regard must be had for the rules of law measuring the solemnities of all land transfers.

Defendant cites a recent case in California, that of McBride v. Freeman (1923), 215 Pac. 678, as supporting the foregoing views, adhering to an earlier decision, that of Werner v. Graham (1919), 181 Cal. 174, 183 Pac. 945. In the case of McBride v. Freeman, supra, the question was stated to be:

"Does one grantee who buys his property with the understanding that it is restricted, and in reliance upon the existence of a general plan of improvement for the whole tract of which his lot forms a part, have a right in equity to enforce the restriction against another grantee who takes with full knowledge and notice of the restriction, the covenants being a part of each and every deed to lots in the tract, and the deeds showing that a uniform plan must have been in existence?"

As to the answer, the court said:

"This precise question was answered adversely to appellant's contentions in the case of Werner v. Graham, 181 Cal. 174 (183 Pac. 945)."

The court then argued the question from various angles, vindicating the soundness of their conclusions, and holding as recited in the syllabus that, "if the parties desire to create mutual rights in real property as to building restrictions, they must so provide in the written instruments exchanged between them, which constitute the final expression of their understanding." In other words, that there can be no enforceable right as to realty founded only in intendment, unless some evidence of that intendment is found in the deed or writing, under which it must be maintained. Had the deed to defendant's vendors reserved the easement for the benefit

of all holders of other lots, it would have been a written declaration of an enforceable trust in the easement, but failing to do that the trust may not rest merely in intendment, because that would be in contravention of the statute of frauds. We think this is the better and safer rule of property regarding real estate, the title to which should not rest in any unrecorded intention, which the years and the exigency of chance obscure and so obliterate as to particular limitations that it would serve rather as a trap than a palladium. There was no real or implied easement in defendant's lot conveyed to complainant Henderson by the title papers which he holds, nor is this proof supplied by any other writing offered, but only in alleged intention, which, not being legally expressed, is immaterial and ineffectual.

Complainant Henderson, therefore, has not shown any cause of action, and the reservations which they call covenants must be held as personal to the grantor, Mr. Emory or his assigns, who alone have the right to sue.

With respect to Emory it is claimed that the covenant or agreement has been fulfilled.

> "Restrictive covenants are in derogation of the right of unrestricted use of property, and are to be strictly construed against the party seeking to enforce them. They will not be enforced by implication, and will include anything not plainly prohibited. Zinn v. Sidler, 268 Mo. 689, L. R. A. 1917A, 455; Hartman v. Wells, 257 Ill., 167, Ann. Cas., 1914A, 901; Morrison v. Hess, 18 A. L. R., 433; Eltrich v. Eicht, et seq., 18 A. L. R., 441."

> "The burden rests upon the person relying on such covenants to bring himself within its terms. These principles apply with especial force to persons who are not parties to the instrument containing the restriction. Stevenson v. Spivey, 21 A. L. R., p. 1278."

With reference to the proof as to cost, it is Mr. Emory's opinion that the house never cost $5000. He says he would take a contract to reproduce it for $4000. While he had been in the house several times and observed it during construction, he yet states that he did not make a careful inspection. He files a statement of A. J. Stair & Son that they will duplicate the house, using the same material and workmanship, for $3950; another from J. A. Cox that he will build it for $4100—a turnkey job as the house now stands, and said that his profit would be inside of that. He was asked:

> "Q. Now suppose your son Sherman Cox testified that this house might cost one man $4000, another man $6000, and another man $10,000, so as a contractor, then, he would be wrong in that statement then? A. He might not be wrong in that

statement, because some men can't do work as cheap as others, I will agree to that.''

"Q. Suppose H. M. Stair of A. J. Stair & Son, you know them? A. Yes.

"Q. They are building contractors? A. Yes.

"Q. Suppose he had stated that he would be willing to build this house for $3900 or $4000, and yet it might cost another man $800 more than that; would he be right in that? A. I don't know about him being right in that or not, but A. J. Stair—there ought not to be that difference, there ought not to be over $200 or $300 difference.''

He said that contractors had differed largely in their prices in building houses on small jobs like this; two or three hundred dollars would be about what might be expected in this kind of a house —this house. As to his own work, while he had not built exactly this type of house, he said he ought to know what it cost. As to his methods he said: "I have got the first job to lose on. If I see I am going to lose on a job, I get out there in the morning and knock my men. My father used to knock me out at three o'clock in the morning, and that is the way I knock my men.''

"Q. And you keep them going? A. Yes, I know just what a man should turn in in a day. I will tell you this, I have served my trade long enough to know what a man can turn off in a day, and if he is not delivering the goods I don't keep him any longer. I check him today—I check him at certain hours, and if he is not coming along as he should, for instance if he is putting down hardwood floors and not getting along with this job, I reach down with my pencil and put a mark at a certain place, and when I come back tomorrow he had better be some where else from that mark.''

He wound up his deposition by admitting that, while it might cost a younger man, starting out without his experience and not knowing how to do things as well as he did, a great deal more money than it would cost him, he yet maintained that there were men there who could do it cheaper than he could, though he did not claim to refer to others who had submitted post hypothetical bids or opinions as to the cost of this particular house without any more detail as to plans or material than that furnished by not much more than a casual observation. While it must be admitted that the plan and methods of Mr. Cox might be fruitful of economic results, it cannot and should not be adopted as a rule of reasonable expectation springing from the efforts of ordinary builders; for if due regard be given to conditions that have abolished the lash of the taskmaster and the achievements of labor in dignifying itself and regulating the hours of its toil, more liberal conditions must be pre-

supposed as characterizing the requirements from less qualified but more considerate men.

When the building was completed defendant furnished the complainant, Mr. Emory, an itemized statement as to its cost, minus any compensation for his own services in its supervision; but such compensation, it is claimed, cannot be considered in arriving at its reasonable cost. Its reasonable cost, we think, would be the fair requirement of the building restriction, executed under the ordinary conditions obtaining at the time and by men of ordinary capacity for such work. Defendant, who supervised the work, and his workmen, should, ordinarily, be better advised as to the cost of the work than anyone else. The defendant and his carpenter testified. He also brought other witnesses, who thought the house was reasonably worth $5000.

Defendant had been in the real estate business about ten months. He determined that he would do his own building. He had built two houses, and testified that the cost of construction of the house in question (on Lot 3) and the garage was $5110.25; that the garage, everything complete, was $177. This would have left his actual expenditure on the house, according to his own statement, $4933.25, but this amount did not include any sum which might justly be allowed' him as compensation for supervision, that, ordinarily, contractors would charge for at ten per cent of cost, and had defendant so let a contract such per cent would have been an item properly constituting a part of the cost. The Chancellor found that the dwelling alone cost $4934, making it, we think, 75 cents too much, according to the figures given by the defendant, but he found that the defendant Sweat had not breached said contract; that the cost of his dwelling alone was at a sum which amounted to a substantial compliance with said covenant or building restriction. He must, therefore, have allowed him some per cent, which, as stated, would have been an item had he let the contract to other builders.

But it is claimed by complainant that it is manifest from the defendant's own proof that the aggregate he claims, when considered with reference to the items which had been furnished as constituting it, showed that it had been padded, and that a number of items were charged not properly pertaining to the cost of the house. He points out in his brief ten particulars aggregating $798.70, which, subtracted from the $4933.25, would leave as the cost $4134.75. Should ten per cent be added to this latter sum it would make the total $4548, indicating a shortage in the reasonable cost of something over four hundred dollars in any event, a discrepancy that could hardly be considered as in compliance with the requirements. This necessitates a review of these items.

Complainants discredit the items largely because they think some of them have been intentionally padded to conceal a lower cost of the house, but while it is manifest that a number of items have been included in the cost of the house which under a strict construction would not properly be so classified, we do not think the circumstances nullify the probative force of the statement to the extent claimed; that, while this original itemized statement was given as the cost of the completed house, yet defendant insists that at the time it was only a tentative estimate, and that the house was not completed; that he got a letter from one of complainant's attorneys something about a lawsuit, and that he got up a statement as nearly right as he could at that time, and that that was not the actual cost; that, while there may have been some items of personal account in the statement, it was due to a mistake of the hardware people who furnished the bill, and not to him. We do not think the evidence justifies us in concluding that there was any intentional effort to have these personal accounts included. Defendant gave the bills to complainant and told him to investigate the matter, and there was found a few items in the aggregate of $558 found to be personal, which the hardware people admitted to be their mistake. And likewise Mr. Emory himself was asked this question; to which he replied as indicated:

"Q. I believe you stated on your direct examination that Mr. Sweat did not tell you that some of the items for these things might not have gone there, but you could go and investigate it; that these bills were bills he had gotten from these concerns, and he thought all of these items went there? A. He mentioned that to me and he gave me these items there covering the complete cost, and told me to investigate it, and when I found that there were items in there that were entirely foreign to the house and reported back to him, and told him he would have to work this up and get them in shape, that I didn't have any time to go to work and investigate and see what he had done, that it was his place to give me bills in proper shape."

Without undertaking to discuss the items in detail, we think the evidence reasonably shows that the total of $4933.25 should be reduced the aggregate of the following items as improper charges not belonging to the account:

Personal items on the hardware bill ..............$36.86
Sodding, ....................................... 29.00
Concrete, that portion from steps to walk, ........ 32.50
Grading, (none being shown as proper) .......... 55.00

> To these should be added for a mistake shown by the
> itemized bill of lumber, ..................... 2.54

Making the sum to be deducted on this account ....$155.90

In addition to these it is claimed that there are overcharges in other items of the statement. It is insisted that by Sweat's own admission the lumber bill as given included both bills for the house and garage. While he states this in so many words, he does not state how much of this lumber went into the garage. He said it was hard to get right down to, because when he built the house he had all the frame work there at the same time; that nothing went into the garage but framing and sheeting, and that what framing he used in addition to that (presumably coming from the bill charged against the house, he had ordered some extra) he had taken from the Luttrell street house, he thought, about $14 worth, but he could hardly say how much it was. So we think it is undoubtedly shown that 800 feet of sheeting and some framing went into the garage. He testifies that the work on the garage was $37.50 and $2.50, or $40, and that the balance would be for lumber. The extra lumber he himself values at $14. So, subtracting $40 labor cost and the $14 on extra lumber, would leave $123 as the cost of the lumber bill, (which includes the 800 feet of sheeting, as lumber charged for but which went into the garage) and therefore this itemized statement is subject to a further reduction of $123.

There were 556 yards of plastering for which in the original statement furnished there was a charge of $336.60, and it also appears that there was an additional charge for material going into the plastering job. It was claimed that sixty-five cents per yard would have been a liberal price for the plastering including, with laths, the furnishing of all material. It was shown that the material cost $127.61; that Seaman, the plasterer, did the work for sixteen cents per yard, or $88.96; the lathing being done by others, the statement showed, at a cost of $27.70. Add these three items together and it makes a total of $244.27. Should you add to this total the cost of 8500 laths at $6.25 per M, or $53.12, it would only amount to $297.-39, or $39.21 short of the $336.60 he has charged for plastering alone. Take, therefore, the $297.39 from the $491.91 claimed as the entire cost, and it would appear that there has been an overcharge of $194.52 in the item of plastering, to say the least of it.

As to the remaining items—carpentering $163.40, flooring $10, brick $97.50 and sheeting $31, we do not think the proof sufficiently establishes the same as an overcharge. But subtracting the other items of improper and overcharges, which together aggregate the sum of $473.42, from the $4,933.25 which the Chancellor found as to actual cost entering into construction of the house, and it

would not appear that the actual cash outlay exceeded $4459.83, and, if there be added to this sum ten per cent as supervision compensation, it would bring the cost up to $4885.81, making it fall short of the $5000 requirement the sum of about $114.19, which we think under the proof is the outside estimate that the defendant can claim as the cost of the completed structure.

We think the defendant should be allowed the ten per cent of cost as compensation for supervision. This would have been an item of cost had he let the building under contract, which Emory himself concedes. Defendant's labor and time in his personal supervision was valuable, and equitably should be regarded as a part of its cost, there being nothing in the restriction limiting same to actual money expended. We think this is a case where the equities require a specific performance, rather than an adjustment in damages.

It results that the finding of the Chancellor that defendant had substantially complied with the building restriction as to its cost and the dismissal of the bill as to complainant Emory is reversed, the assignment being sustained to this extent. The defendant will be required to make an additional expenditure upon the house of at least $114.19, or remove the same within six months from the date of this decree, or the same may be done by complainant under the orders of this court and the expense of such removal charged against the lot. It is decreed also that there are no superior equities existing in the Bankers Trust Company, the mortgagee of defendant, that would prevent this result.

Complainants will pay the costs incident to Henderson being made a party. The defendant Sweat will pay the balance of the costs, and the cause will be remanded to the chancery court for the enforcement and carrying out of this decree.

Portrum and Thompson, JJ., concur.