Mrs. Adele Morton Ridley, Complainant, Appellant, *v.*
B. Haiman, Defendant, Appellee.

(*Nashville,* December Term, 1931.)

Opinion filed March 26, 1932.

240

Roy A. Miles, John A. Pitts, Louis Leftwich and Paul Williams, for complainant, appellant.

Higgins & Moore, for defendant, appellee.

Mr. Chief Justice Green delivered the opinion of the Court.

This suit was brought by the owner of a lot, adjacent to a lot owned by defendant, to enjoin the latter from erecting a filling station. Both lots are on West End Avenue, or Harding Road, in a high-class residential section of Nashville . Complainant charges that defendant holds title under a restrictive covenant as to the use of his property and complainant seeks to enforce that covenant. The chancellor decreed for complainant. The Court of Appeals reversed the decree of the chancellor and dismissed the bill. Both parties filed petitions for the writ of *certiorari* and both petitions have been granted.

In 1916 and prior thereto, the Kenner-Manor Land Company owned two contiguous tracts of land, fronting on West End Avenue or the Harding Road. This company subdivided these tracts into 163 lots, numbering the lots, laying out streets, etc. A plan of the subdivision was recorded but no restrictions were set out in the registered plan.

On May 16, 1916, following considerable advertising, a public sale of this land was undertaken at auction. In the advertisement of sale, by newspaper, posters and circulars, it was stated that there would be "moderate restrictions to protect it as a desirable home section." Before the sale restrictions were publicly read by one of the real estate agents and it was announced that the lots would be sold subject to said restrictions.

Five such restrictions were proclaimed, only one of which it is necessary to notice, as follows:

"That no shop, store, factory, saloon or business house of any kind, no hospital, asylum, or institution of like or kindred nature, and no charitable institution shall be erected and maintained on the premises hereby agreed to be conveyed, but the said premises shall be occupied and used for residential purposes only, and not otherwise."

Forty-nine lots were sold on this occasion, including all the lots fronting on the Harding Road or West End Avenue. Printed deeds were prepared, containing the five restrictions noted, and the deeds executed to all purchasers were practically identical. These deeds, moreover, contained this clause:

"The foregoing five stipulations, covenants and conditions are and shall be binding and obligatory upon, and shall be observed by, the said grantee and heirs, devisees, successors, and assigns, until the first day of January,

A. D. 1938; and it is expressly agreed that all and every of said stipulations, covenants, and conditions shall attach to and run with the land, and shall be binding and obligatory upon all and every person or persons who may now or hereafter own, possess, occupy or use said premises or any part thereof, or any building or structure thereon, under any tenure whatsoever.''

The proof shows that it was the intention of the land company to sell all the lots in the subdivision upon the same terms with the exception of some fourteen or more. The portion of the property including these lots had been previously mortgaged to secure advances obtained by the land company for development. This part of the land was later conveyed without restrictions. None of it, however, was located on Harding Road or West End Avenue, and so far as the record shows, none of it has been used for business purposes and, from the map sent up, none of it appears to be suitable for business purposes. Other lots in the subdivision were thereafter sold by the land company, all of them subject to restrictions similar to the restrictions contained in the deeds executed for the lots sold at auction.

Lot No. 1 on the Harding Road was purchased by John T. Landis. A cash payment was made by him and notes executed for the balance. These notes appear to have come into the possession of Duncan F. Kenner, who originally owned the land, and to whom the land company owed a balance of purchase money secured by lien. Kenner signed all deeds for lots sold at the auction sale by way of releasing his lien.

Landis failed to record his deed to lot No. 1 but the proof as to its contents is clear and his deed was similar to the others and embodied the same restrictions. Shortly after Landis bought lot No. 1, and before he paid the

purchase money notes, he was forced into involuntary bankruptcy. Lot No. 1 was sold by the trustee in bankruptcy of Landis to Duncan F. Kenner and a deed executed to Kenner containing no restrictions.

Kenner thereafter undertook to sell lot No. 1 to Bissinger. Upon examination of the abstract, it was discovered by Bissinger's attorney that there was nothing of record taking the title to the lot out of the Kenner Manor Land Company and Bissinger declined the title. Kenner thereupon filed a bill in the chancery court to clear up his title and in that suit Kenner proved the execution of the deed by the Kenner Manor Land Company to Landis and also proved the contents of that deed, including the restrictions. The chancellor thereupon declared Kenner to have a good fee simple title to the land.

Kenner's negotiations with Bissinger, notwithstanding the chancery proceedings mentioned, appear to have come to nothing and thereafter Kenner advertised lot No. 1 for sale, as the only unrestricted lot "on the Harding Road between Ensworth Avenue and Kenner Avenue." The defendant Haiman became interested in the property and Kenner made him a written proposition of sale, which was accepted. Notwithstanding the tenor of his advertisement, Kenner set out in the written offer accepted by Haiman the following: "I will make a deed to said property, unrestricted, but do not guarantee against any complaints or suits which may be filed in case the property is to be used for any purpose other than a residence."

Under such circumstances Haiman bought lot No. 1, obtaining from Kenner a warranty deed without restrictions, and shortly thereafter Haiman proceeded with the erection of a filling station. He was enjoined by the

complainant after the concrete floor and approaches were laid and pumps put in, before any building was erected.

The complainant is the owner of the east one-half of lot No. 2 in the aforesaid subdivision. Her lot is immediately adjacent to that of the defendant, both fronting on the Harding Road or West End Avenue. Mrs. Ridley bought from the Bransford Realty Company. The Bransford Realty Company bought lot No. 2 at the auction sale and took a deed with the aforesaid restrictions and that company conveyed the east half of lot No. 2 to Mrs. Ridley upon the same restrictions. Mrs. Ridley has erected a nice residence on her lot, her property, as we gather from the record, being estimated to be of the value of about $10,000.

█ The complainant, Mrs. Ridley, was out of the city when defendant Haiman began work on his filling station. She returned when the work had advanced to the stage above mentioned and immediately advised with counsel and brought this suit. We think, therefore, no laches can be imputed to her, notwithstanding the contention of defendant's counsel.

█ The Court of Appeals found that Haiman was affected with notice of the restrictions contained in the deed from the Kenner Manor Land Company to Landis, as did the chancellor, and this is the first matter complained of in the defendant's petition for *certiorari.*

We think the two courts were clearly right. Haiman claims under Landis through Kenner. In order to clear up the title to this lot, it was necessary for Kenner, Haiman's immediate predecessor in title, to prove the deed from the Kenner Manor Land Company to Landis. This Kenner did in the case of Kenner against Bissinger, as above stated, and the contents of the deed to Landis

were proven in that case. All this is a part of Haiman's direct chain of title and with respect to all of this he is charged with notice.

Moreover, a reading of Haiman's deposition herein does not satisfy us that he was without actual notice of the restrictions upon all these lots. In addition, there is the significant passage from Kenner's offer of sale heretofore quoted.

■ The Supreme Court of Michigan has suggested that when one buys into a high-class residence neighborhood where there are no business houses, such a situation, open to him, puts upon the purchaser a duty of inquiry. *Sanborn* v. *McLean,* 233 Mich., 277, 200 N. W., 496, 60 A. L. R., 1212. Certainly the purchaser cannot willfully close his ears and shut his eyes.

■ If, as we hereafter undertake to show, the restrictions contained in the deeds made to purchasers at the auction sale of the Kenner Manor Land Company were for the benefit of all those purchasers and available to all of them, such restrictions cannot be released without the assent of these purchasers or grantees for whose benefit they were imposed. *Hopkins* v. *Smith,* 162 Mass., 444, 38 N. E., 1122; *Hills* v. *Miller,* 3 Paige, 254, 24 Am. Dec., 218; *Weston* v. *Macdermot,* L. R. 1 Eq., 499, L. R. 2 Ch., 72. Kenner's effort therefore to sell the property to Haiman free of restrictions was without effect.

Defendant relies on *Yates* v. *Chandler,* 162 Tenn., 388, for the proposition that he was not affected with notice of the contents of the deed of the Kenner Manor Land Company to Landis. This case is not at all in point. The court there held that a purchaser was only charged with notice of things appearing in his direct chain of title, that he was not charged with notice of things appearing in a deed of his grantor conveying other property.

■ The defendant likewise criticises the other courts for holding that defendant's title was not settled by the decree in the case of Kenner against Bissinger, wherein Kenner was adjudged to have the absolute title to the lot. It is sufficient to say that Mrs. Ridley was not a party to that suit and the decree therein could not be *res adjudicata* as to her. The statute of limitations was also relied on by the defendant but there was no evidence of an adverse possession of lot No. 1 by defendant or his predecessors in title.

Although the Court of Appeals agreed with the chancellor in the particulars heretofore noted, following the case of *Emory* v. *Sweat,* 9 Tenn. App., 167, that court reversed the chancellor's decree and dismissed the bill.

In *Emory* v. *Sweat* it was held where the owner of an addition conveyed various lots, each containing building restrictions, but the deeds not providing that the restrictions were for the benefit of anyone other than the grantor, the purchasers of other lots acquired no interest in these restrictions, although their deeds contained like restrictions and they were verbally told that the easements were for the mutual benefit of those purchasing property in the addition.

This ruling in *Emory* v. *Sweat* was not necessary to the decision of that case and was not approved by this court when the petition for *certiorari* filed therein was denied. In *Emory* v. *Sweat* the bill was brought by the common grantor, joined by a grantee of one lot, to enforce a building restriction against the grantee of another lot. It was held that this restriction could be enforced at the suit of the original grantor and it was enforced in that case. What was said about the rights of one grantee with respect to another grantee was not called

for and was not a material factor in the decision of the case.

This expression from *Emory* v. *Sweat* finds support in *Werner* v. *Graham,* 181 Calif., 174, 103 Pac., 945, and in *McBride* v. *Freeman,* 191 Calif., 152, 215 Pac., 678. In the latter case it is conceded that the California rule is opposed to the weight of authority.

The Court of Appeals herein also held the chancellor erred in admitting oral testimony over defendant's objections as to the nature of the restrictions contained in the deed of the Kenner Manor Land Company to Landis and in admitting proof as to the announcement made at the auction sale that the restrictions were for the mutual benefit of those purchasing lots in the subdivision. This action of the Court of Appeals was based on *McGannon* v. *Farrell,* 141 Tenn., 631, 214 S. W., 432.

Insofar as the deed to Landis is concerned, as heretofore noted, that deed and its contents, including the restrictions, was proven by defendant's predecessor in title in the case of Kenner against Bissinger. The complainant here merely introduced the record in Kenner against Bissinger, as a part of defendant's chain of title, to show the things of which defendant was charged with notice.

The deed to Landis contained the restriction, the covenant, sought to be here enforced by the defendant. The parol evidence introduced did not tend toward the contradiction or varying of this deed nor did it add any new covenant to the deed. Such evidence was therefore not inadmissible under *McGannon* v. *Farrell, supra.*

The deed to Landis contained the restrictions but did not set out the beneficiaries of those restrictions. The deed left the matter open as to whether the restrictions were provided for the benefit of the vendor or whether

they were provided for the benefit of the vendor and the grantees of the other lots sold. This matter was therefore one concerning which parol proof was admissible.

■ Whether a person not a party to a deed containing a restrictive covenant is entitled to enforce that covenant depends upon the intention of those who were parties thereto. A grantor has a right to impose such legal restrictions as he desires upon the property he aliens. The grantee of course must be apprised of the grantor's intention. The intention of the parties is to be gathered not alone from the written contract but when that instrument is indefinite, such intention is to be gathered from the circumstances of the case. *Hay* v. *St. Paul M. E. Church,* 196 Ill., 633, 63 N. E., 1040; *Beals* v. *Case,* 138 Mass., 138; *Hane* v. *Bigelow,* 155 Mass., 341, 29 N. E., 628; *Clark* v. *DeVoe,* 124 N. Y., 120, 26 N. E., 275, 21 Am. St. Rep., 652; *Nottingham, etc., Co.* v. *Butler,* L. R., 15, Q. B. Div., 261, 16 Q. B. Div., 778.

■ The general rule is that where the owner of a tract of land subdivides it and sells the different lots to separate grantees, and puts in each deed restrictions upon the use of the lot conveyed, in accordance with a general building, improvement or development plan, such restrictions may be enforced by any grantee against any other grantee.

This rule is recognized in *Laughlin* v. *Wagner,* 146 Tenn., 647, wherein it is said:

"Unquestionably it is an established rule of law that a person owning a body of land may sell portions thereof and make restrictions as to its use for the benefit of himself as well as those to whom he sells other portions of the land, and he may invoke the remedy of injunction to prevent a violation of the same, in proper cases, provided

of course the restriction is not against some public violation. (?) (policy.) There is certainly good reason in this rule when applied to the common practice of inserting in deeds a restriction such as tends to create a residential section against those uses which would tend to mar the beauty and detract from the value of the property by uses inconsistent with the uses intended. In such deeds the grantee does not acquire an absolute and unqualified title, but it is a part of the title which he accepts, that the use of the land shall be limited and be restricted in use as provided by the deed. 13 Cyc., 718, 7 R. C. L., 1114; Pomeroy's Equity, vol. 2, section 1695.''

In *Laughlin* v. *Wagner,* as in *Emory* v. *Sweat, supra,* the common grantor joined in a suit with certain of his grantees against another of his grantees to enforce the covenant. So that *Laughlin* v. *Wagner* did not directly adjudicate the liability of one grantee to suit by another grantee about such matter.

Decisions concerning restrictive covenants are so numerous that it would be impracticable to attempt a review of all of them or to attempt any classification of them.

In *Korn* v. *Campbell,* 192 N. Y., 490, 85 N. E., 687, 127 Am. St. Rep., 925, Judge WERNER says that, although the decisions appear to be in hopeless conflict, they are easily reconcilable when their peculiar circumstances are understood. In that case the court first considers a class of cases where restrictive covenants are entered into with the design to carry out a general scheme for the improvement or development of real property and says:

''This class embraces all the various plans, generally denominated in the English cases as building schemes, under which an owner of a large plot or tract of land

divides it into building lots to be sold to different purchasers for separate occupancy, by deeds which contain uniform covenants restricting the use which the several grantees may make of their premises. In such cases the covenant is enforceable by any grantee as against any other upon the theory that there is a mutuality of covenant and consideration which binds each, and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of a lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract.''

Some of the cases refer to the rights which the several purchasers acquire under these restrictive covenants in the several deeds as mutual or reciprocal negative easements. *Eckhart* v. *Irons,* 128 Ill., 568, 20 N. E., 687; *Sanborn* v. *McLean,* 233 Mich., 227, 200 N. W., 496, 60 A. L. R., 1212.

In *Parker* v. *Nightingale,* 6 Allen, 341, 83 Am. Dec., 632, the court upheld the right of one grantee of a common grantor to enforce a restrictive covenant against another grantee, where there was a general development scheme and all the deeds contained restrictive covenants, saying:

''The purpose intended to be accomplished by the restrictions inserted in the deeds of the estate, now owned and occupied by the defendants, was for the benefit and advantage of other owners of lots situated on the same street or court. . . . By excluding all erections for the purposes of trade, and appropriating each lot to a prescribed use as a dwelling-house, the entire neighbor-

hood comprised within the limits of the original tract laid out for a street or court was secured against annoyances arising from occupations which would impair the value of the several lots as places of residence. . . . Thus it entered into the consideration which each purchaser paid for his land, either by enhancing its price in view of the benefit secured to him in the restraint imposed on adjoining owners, or by lessening its value in consequence of the limitation affixed to its use."

One of the leading English cases on this subject is *Nottingham Brick, etc., Co.* v. *Butler,* 15 Q. B. Div., 261. In that case it was said by WILLS, J.:

"The principle which appears to me to be deducible from the cases is that where the same vendor, selling to several persons plots of land, parts of a larger property, exacts from each of them covenants imposing restrictions on the use of the plots sold, without putting himself under any corresponding obligation, it is a question of fact whether the restrictions are merely matters of agreement between the vendor himself and his vendees, imposed for his own benefit and protection, or are meant by him and understood by the buyers to be for the common advantage of the several purchasers. If the restrictive covenants are simply for the benefit of the vendor, purchasers of other plots of land from the vendor cannot claim to take advantage of them. If they are meant for the common advantage of a set of purchasers, such purchasers and their assigns may enforce them *inter se* for their own benefit."

Again he said: "Where he (the vendor) retains none (of the property), how can the covenants be for his benefit and for what purpose can they be proposed, except that each purchaser, accepting the benefit of them

as against neighbors, may be willing on that account to pay a higher price for his land than if he bought at the risk of whatever use his neighbor might choose to put his property to?''

On appeal of this case (16 Q. B. Div., 778), Lord ESHER, M. R., said:

''It has been argued that there are no restrictive covenants capable of being enforced in that way (by one purchaser against another), because there was no covenant, either in writing or otherwise in express terms, that each covenantor—each original purchaser—would consider himself bound to the other purchasers, and there was no covenant by the original vendor. But I think that WILLS', J.'s, view of the law on this subject is perfectly correct. In my view, he is right in saying that, when an estate is put up for sale in lots, subject to a condition that restrictive covenants are to be entered into by each of the purchasers with the vendor, and the vendor is intending at this sale to sell the whole of the property, the question whether it is intended that each of the purchasers shall be liable in respect of those restrictive covenants, to each of the other purchasers, is a question of fact, to be determined by the intention of the vendor and of the purchasers, and that question must be determined upon the same rules of evidence as every other question of intention. And, if it is found that the purchasers should be bound by the covenants *inter se,* a court of equity will, in favor of one of the purchasers, insist upon the performance of the covenants by any other of them, and will do so under such circumstances without introducing the vendor into the matter.''

One of the leading American cases on this subject is *De Gray* v. *Monmouth Beach Club House Co.,* 50 N. J. Eq., 329, 24 Atl., 388. This case contains an elaborate

review of the authorities and Vice Chancellor GREEN states his conclusion as follows:

"Where there is a general scheme or plan, adopted and made public by the owner of a tract, for the development and improvement of the property, by which it is divided into streets, avenues, and lots, and contemplating a restriction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser; and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof; and the covenants are actually inserted in all deeds for lots sold in pursuance of the plan; one purchaser and his assigns may enforce the covenant against any other purchaser and his assigns, if he has bought with knowledge of the scheme, and the covenant has been part of the subject-matter of his purchase."

. . . . . .

"The equity would seem to spring from the presumption that each purchaser has paid an enhanced price for his property, relying on the general plan, by which all the property is to be subjected to the restricted use, being carried out, and that while he is bound by and observes the covenant, it would be inequitable to him to allow any other owner of lands, subject to the same restrictions, to violate it."

In *Elliston* v. *Reacher* (1908), 2 Ch., 374, affirmed (1908), 2 Ch., 665, after a review of the English cases, PARKER, J., laid down the following rule as to the enforcement of restrictive covenants by purchasers *inter sese*:

"It must be proved (1) that both the plaintiffs and defendants derive title under a common vendor; (2) that previously to selling the lands to which the plaintiffs and defendants are respectively entitled the vendor laid out his estate, or a defined portion thereof (including the lands purchased by the plaintiffs and defendants respectively), for sale in lots subject to restrictions intended to be imposed on all the lots, and which, though varying in details as to particular lots, are consistent and consistent only with some general scheme of development; (3) that these restrictions were intended by the common vendor to be and were for the benefit of all the lots intended to be sold, whether or not they were also intended to be and were for the benefit of other land retained by the vendor; and (4) that both the plaintiffs and the defendants, or their predecessors in title, purchased their lots from the common vendor upon the footing that the restrictions subject to which the purchases were made were to inure for the benefit of the other lots included in the general scheme whether or not they were also to inure for the benefit of other lands retained by the vendors. If these four points be established, I think that the plaintiffs would in equity be entitled to enforce the restrictive covenants entered into by the defendants or their predecessors with the common vendor irrespective of the dates of the respective purchases."

We think the facts proven bring this case directly within the authority of those from which we have quoted. The landowner here subdivided its property and sold it off in lots pursuant to a general development plan. The landowner was a corporation organized for dealing in real estate. It proposed to sell all of these lots. Not proposing to retain any of the property, the restrictive

covenants naturally could not have been intended for its benefit. By imposing such restrictions for the benefit of the several grantees, the sale value of the lots was increased. In view of the advertisements made in advance of the auction sale and of the announcements made at the auction sale, we think every purchaser understood that this development was designed for a high-class residence section and that these restrictions intended to be available to each grantee entered into the consideration of every purchase.

We have considered the authorities relied on by the defendant and think that they are all distinguishable upon their facts, except the California cases, which we are not disposed to follow.

As above stated, decisions on this branch of the law are quite numerous and will be found collected in Notes, 14 Anno. Cas., 1021, 21 A. L. R., 1281, 33 A. L. R., 676.

 It is argued that the Kenner Manor Land Company had no general development or building scheme, since it sold fourteen lots unrestricted, as heretofore mentioned, and also sold another part of the original tract unrestricted. It is not clear on the record whether this last portion had been subdivided. These sales did not reflect in any wise upon the grantor's intention. Certain mortgages were made, or trust agreements, respecting portions of the land to secure money to pay for and improve the property. The sales referred to were in satisfaction of these mortgages. They were made unrestricted because the land company was required so to make them. Anyhow, none of this property is on the Harding Road or West End Avenue and none of it has been used for business purposes. The necessities of the grantor required it to sell so much of its property un-

restricted but the remainder of its property was sold under restrictions.

We think there has been no such growth of the city and encroachment of business in the neighborhood of these lots as would render the enforcement of these restrictions inequitable. The record does show that there is or was a miniature golf course across the street, not a part of this property. The nearest business place of any other nature is two thousand feet away, over a hill. The neighborhood is exclusively residential, with these exceptions, all good homes, some very fine homes.

In *Emory* v. *Sweat* it is suggested that the rule we here follow has the effect of creating an easement or estate in land by parol. This is a mistake, as noted in *Laughlin* v. *Wagner, supra*. It is said therein that, "In such deeds the grantee does not acquire an absolute and unqualified title, but it is a part of the title which he accepts, that the use of the land shall be limited and be restricted in use as provided by the deed." And in *Parker* v. *Nightingale, supra,* it is said, "The restriction on the use of the premises contained in the deed, operated as a qualification of the fee, and was in the nature of a reservation or exception out of the estate granted. Thus there was an interest or right created by the deed itself."

For the reasons stated, the decree of the Court of Appeals is reversed and the decree of the chancellor affirmed.