KLN ASSOCIATES, Plaintiff/Appellant,

v.

The METRO DEVELOPMENT & HOUSING AGENCY, and the Metropolitan Government of Nashville and Davidson County, Defendants/Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 10, 1990.

Permission to Appeal Denied by Supreme Court, Oct. 22, 1990.

---

1. The mother denies there was agreement and the court subsequently found there was no meeting of the minds.

Robert S. Patterson, Jeffrey S. Bivins, Boult, Cummings, Conners & Berry, Nashville, for plaintiff/appellant.

George E. Barrett, Nashville, for the Metro Development and Housing Agency.

James L. Murphy, III, Nashville, for the Metropolitan Government of Nashville and Davidson County.

## OPINION

KOCH, Judge.

This appeal concerns the off-street parking requirements for a proposed office development in Nashville's University Center Urban Renewal Area. The property owner filed a declaratory judgment action in the Chancery Court for Davidson County, insisting its development should be subject to the zoning ordinance's requirements rather than the more stringent requirements in the urban renewal plan. The parties submitted the case on stipulated facts, and the trial court held that the urban renewal plan's requirements applied to the development. The property owner has appealed. We affirm the judgment.

## I.

In July, 1967, the Metropolitan Development and Housing Agency's ("MDHA") predecessor adopted an urban renewal plan for the "University Center Urban Renewal Area." The project included the areas of Nashville surrounding Vanderbilt University, George Peabody College for Teachers, Scarritt College, and Belmont College.[1]

The Metropolitan Council approved the plan in August, 1967, and the housing authority recorded it in the register's office. Its enactment enabled the housing agency to receive Title I loans and grants from HUD that eventually exceeded $17,000,000. The City spent an additional $10,000,000 on the project, while private developers spent another $100,000,000.

The plan contemplated that all the property in the project area would be designated either for redevelopment or for rehabilitation. The structures beyond feasible rehabilitation would be demolished to make way for new development, while those suitable for retention and continued use would be rehabilitated.

The plan also contained general requirements applicable to all properties in the project area until December 31, 1997. Originally, these requirements were similar

---

1. The plan was adopted in accordance with Tenn.Code Ann. § 13–20–206 (1987) and Federal Housing Act § 112, 42 U.S.C. § 1463 (1976) which authorized the use of federal funds to rehabilitate blighted areas surrounding educational institutions and hospitals. The Department of Housing and Urban Development's ("HUD") authority to make grants and loans under Section 112 was terminated effective January 1, 1975 by 42 U.S.C. § 5316 (1976).

to the zoning requirements. However, during the years after the plan's adoption, the Metropolitan Council changed the zoning ordinance without making corresponding changes in the plan. One particular difference between the plan and the present zoning ordinance fuels this dispute.

When it was adopted, the plan, like the zoning ordinance, contained an off-street parking restriction requiring business or professional offices to provide one parking space for each two hundred square feet of gross floor area. The Council later relaxed the zoning ordinance to require only one parking space for each four hundred square feet. However, neither the MDHA nor the Council have made similar changes in the urban renewal plan's off-street parking requirements.

A residential apartment complex, now known as the Westboro Apartments, is on the eastern border of the project area. Its owner [2] had actual notice of the existence of the urban renewal plan and of its contents prior to the plan's adoption. In December, 1968, the housing authority notified the owner that the plan called for the property's rehabilitation and that it intended to conduct an inspection and to prepare a "report on the repairs and improvements ... considered necessary to bring it up to project standards." These reports were prepared in December, 1968 and again in May, 1969.

The record reveals little about the apartment complex for the next eighteen years. It continued to be used as apartments, and it changed hands on at least two occasions. By 1987, it was owned by The Corporeal Group ("Corporeal"), a Tennessee general partnership composed almost exclusively of physicians. In March, 1987, Corporeal entered into a contract to sell the apartments for $3,300,000 to Elkay Properties, Inc. ("Elkay") who intended to construct new business and professional offices on the site. The deal was never consummated,

apparently because of the question concerning the applicability of the off-street parking requirements in the urban renewal plan.

Corporeal and Trion Properties, Inc. ("Trion"), Elkay's successor corporation, filed this action in November, 1987 seeking a declaration that the off-street parking requirements in the urban renewal plan did not apply to the proposed redevelopment of the property. Approximately one month later, Corporeal entered into a contract to sell the apartments to Trion for $3,200,000. Corporeal specifically agreed in the contract to permit Trion to act as its agent in the pending litigation and to assign Trion all its interest in the suit.

On January 28, 1988, Trion assigned its interest in the Corporeal contract to KLN Associates ("KLN"), a Georgia general partnership whose partners were also the principals of Elkay and Trion. On the same day, Corporeal conveyed the property to KLN by general warranty deed specifically making the conveyance subject to this lawsuit. Thereafter, KLN succeeded Corporeal and Trion as the plaintiff in this proceeding.

## II.

KLN first challenges the urban renewal plan by characterizing it as an improperly enacted zoning ordinance. While the plan, like a zoning ordinance, contains restrictions on the use of private property, it need not be adopted as a zoning ordinance in order to be effective. The restrictions in the plan are valid as long as the plan was adopted in accordance with the statutory procedures governing urban renewal plans.

### A.

▆▆▆▆ The government's authority to exercise its police power to impose restrictions on the use of private property is now firmly established. *Draper v. Haynes*, 567

---

**2.** The property was apparently owned by a New York resident who used the trust department of a Nashville bank as her agent.

S.W.2d 462, 465 (Tenn.1978); *Knoxville Hous. Auth., Inc. v. City of Knoxville*, 174 Tenn. 76, 82–83, 123 S.W.2d 1085, 1987–88 (1939); *McKelley v. City of Murfreesboro*, 162 Tenn. 304, 311, 36 S.W.2d 99, 101 (1931). The scope of the police power is broad, *H & L Messengers, Inc. v. City of Brentwood*, 577 S.W.2d 444, 452 (Tenn. 1979); *Knoxville v. Knoxville Water Co.*, 107 Tenn. 647, 685–86, 64 S.W. 1075, 1085 (1901), and the General Assembly has the prerogative to decide when and how it will be exercised, subject only to the limitations in the state and federal constitutions. *Motlow v. State*, 125 Tenn. 547, 589–90, 145 S.W. 177, 188 (1911).

The local governments' power to control the use of private property derives from the General Assembly. *State ex rel. SCA Chem. Servs., Inc. v. Sanidas*, 681 S.W.2d 557, 562 (Tenn.Ct.App.1984). Thus, the validity of local regulations should be measured against the statutes authorizing local governments to act.

The General Assembly has not limited local governments' authority to control the private use of property to the enactment of zoning ordinances. The counties and cities were first empowered to adopt zoning ordinances in 1935.[3] However ten years later, the General Assembly granted them the power to redevelop blighted areas.[4] In order to initiate a redevelopment project, Tenn.Code Ann. § 13–20–203(a)(1)(B) required the local legislative body to approve a "redevelopment plan" that "indicate[d] proposed land uses and building requirements in the area."

Later, in 1955, the General Assembly also empowered local governments to "plan and undertake urban renewal projects."[5] Like the redevelopment projects authorized ten years earlier, Tenn.Code Ann.

§ 13–20–211(a)(2) required the preparation of an urban renewal plan containing "zoning and planning changes, if any, land uses, maximum densities, [and] building requirements." Tenn.Code Ann. § 13–20–211(b) also required the local legislative body to approve the plan using the same procedure used to approve redevelopment plans.

Once the local legislative body approves an urban renewal plan, the local housing authority's power to implement it is as broad as its authority to implement redevelopment plans. *See* Tenn.Code Ann. § 13–20–212(a). Specifically, Tenn.Code Ann. § 13–20–212(a)(2) empowers local authorities to make

plans for the enforcement of laws, codes, and regulations relating to the use of land and the use and occupancy of buildings and improvements, and to the compulsory repair, rehabilitation, demolition, or removal of buildings and improvements.

In this case, MDHA's predecessor had the authority by virtue of Tenn.Code Ann. § 13–20–212(a)(2) to include in its urban renewal plan regulations governing the use and occupancy of the buildings and improvements in the project area. It adopted a plan containing these regulations in accordance with Tenn.Code Ann. § 13–20–211(a), and its plan was approved by the Metropolitan Council as required by Tenn.Code Ann. § 13–20–211(b). The regulations contained in the plan became fully enforceable upon the plan's approval without resorting to the local government's independent zoning authority.

### B.

■ The ordinance approving the urban renewal plan at issue in this case specifically recognized that the adoption of the plan

---

**3.** *See* Act of Feb. 12, 1935, ch. 33, 1935 Tenn. Pub. Acts 52, now codified at Tenn.Code Ann. §§ 13–7–101, –115 (1987 & Supp.1989) (counties); Act of Feb. 12, 1935, ch. 44, 1935 Tenn. Pub. Acts 117, now codified at Tenn.Code Ann. §§ 13–7–201, –210 (1987 & Supp.1989) (cities).

**4.** *See* Act of Feb. 22, 1945, ch. 114, 1945 Tenn. Pub. Acts 553, now codified at Tenn.Code Ann. §§ 13–20–201, –208 (1987 & Supp.1989).

**5.** *See* Act of Mar. 10, 1955, ch. 181, 1955 Tenn. Pub. Acts 695, now codified at Tenn.Code Ann. §§ 13–20–209, –215 (1987 & Supp.1989).

would require changes in zoning. KLN construes this as a concession that the land use regulations in the plan could not become effective until they were included in the zoning ordinance.

■ An urban renewal plan is, first and foremost, a plan for the uniform development of an area. The fact that it contemplates zoning changes does not transform it into a zoning ordinance. *Donnelly Advertising Corp. v. City of Baltimore*, 279 Md. 660, 370 A.2d 1127, 1130–31 (1977). It may contain standards and regulations governing the property in the area, and these regulations will control the use of the property once the plan is approved, even if they differ from the regulations governing the rest of the city as a whole. *Argentine Citizens Comm. v. Urban Renewal Agency*, 194 Kan. 468, 399 P.2d 553, 555 (1965).

We construe the language relied upon by KLN as the Council's recognition that, within the project area, the restrictions in the plan take precedence over those in the zoning ordinance and that the zoning ordinance should reflect the plan's requirements. The Council's approval of the plan made the plan's standards and regulations the acts of the City, and no further action was required to make them enforceable.

### C.

■ KLN also asserts that even if the plan was enforceable when it was first approved, it is no longer enforceable because the 1967 ordinance approving the plan was repealed by a 1988 ordinance recodifying the Metropolitan Code. We find this argument to be unconvincing because the recodification ordinance was not intended to affect prior rights or obligations.

The 1967 ordinance approving the urban renewal plan also authorized the City to enter into a cooperation agreement with the housing authority and enabled the housing authority to apply for Title I funding for the project. The Council's approval was a necessary prerequisite to the validity of the plan and to the receipt of Title I funding. *See* 42 U.S.C. § 1455(a) (1976). After the Council passed the ordinance approving the plan, the housing authority and HUD entered into a loan and capital grant contract. In return for receiving the Title I loans and grants that eventually amounted to $17,000,000, the housing authority agreed to complete the project "in accordance with the urban renewal plan."

The 1988 recodification ordinance repealed all ordinances of a "general and permanent nature" approved and passed before June 30, 1986 if they were not included in the recodification. However, in addition to specifically exempting several earlier ordinances, it also stated that it would not affect "any contract or right established or accruing January 22, 1987" or "any right or franchise conferred by ordinance or resolution on any person or corporation."

The 1967 ordinance approving the plan was not an ordinance of a general and permanent nature. The Council enacted it solely to initiate the project as required by Tenn.Code Ann. § 13–20–211(b). Once the Council approved the plan, it was the plan, not the ordinance, that governed the project. The plan applied only to the areas of the city covered by the plan and was never intended to be permanent because, by its own terms, it expires on December 31, 1997.

The 1967 ordinance conferred on the housing authority the right to apply for and receive Title I funds. The contract between the housing authority and HUD was based on the plan and obligated the authority to complete the project in accordance with the plan. Both the housing authority and HUD relied on the plan as approved by the Council. The projects called for in the plan have been undertaken, and both public and private funds have been expended in reliance on the plan. Accordingly, we do not find that the 1988 recodification ordinance brought the plan to a premature end.

### III.

■ KLN's next argument is that it cannot be forced to comply with the plan's

off-street parking requirements because they are not in its chain of title. We disagree. While this statement is correct as far as it goes, it does not completely embody Tennessee's common law with respect to the enforceability of restrictions on property.

■ Otherwise valid restrictions on property are binding even when they are not in the chain of title if the owner had actual knowledge of the restrictions when it acquired the property. *Land Developers, Inc. v. Maxwell,* 537 S.W.2d 904, 913 (Tenn. 1976); *Ridley v. Haiman,* 164 Tenn. 239, 247, 47 S.W.2d 750, 752 (1932); *Stracener v. Bailey,* 737 S.W.2d 536, 539 (Tenn.Ct. App.1986); *see also Urban Renewal Agency v. Bridges Signs, Inc.,* 717 S.W.2d 701, 702–03 (Tex.Ct.App.1986).

Even though the plan's general requirements were not in KLN's chain of title, it is difficult to argue that KLN did not have actual notice of them in January, 1988 when it acquired the Westboro Apartments. Its partners were aware of the plan's requirements by virtue of their positions with Elkay and Trion. It purchased the property pursuant to a contract that specifically mentioned the legal proceedings challenging the application of the requirements, and the warranty deed it received made the conveyance subject to the outcome of these proceedings. Accordingly, KLN's argument that it is not bound by the plan's restrictions because they were not in its chain of title is without merit.

### . IV.

■ Finally, KLN insists that MDHA cannot impose the plan's off-street parking regulations on its project without first negotiating a written compliance agreement. We find this argument misplaced because the plan's negotiation procedure applies only to the properties located in the areas designated for clearance.

The urban renewal plan contained a land acquisition map identifying the areas and the properties designated for clearance and redevelopment and those designated for rehabilitation. It also contained nineteen "general regulations and controls" applicable to "all land within the project area." With specific regard to the areas designated for clearance, the plan stated:

> The provisions and requirements set forth herein under Section C, shall also apply to all property within clearance sections which are identified in Land Acquisition Map (U.R.P. Map No. 3) as not to be acquired. Written agreement to abide by said provisions shall be negotiated by the Authority with the owners of said properties commencing within six months of adoption of this Urban Renewal Plan. Failure to comply may cause the Authority to acquire such property, if such acquisition may be necessary to achieve the objectives of the Plan.

KLN's reliance on this provision is unfounded. Its property is located in the rehabilitation and conservation section of the project and has never been designated as property to be acquired or demolished. Accordingly, the plan's general regulations and controls, including those relating to off-street parking are applicable without prior negotiation.

### V.

We affirm the judgment and remand the case to the trial court for whatever further proceedings may be required. We also tax the costs of this appeal against KLN Associates and its surety for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.