# R. L. OWENBY et al. v. LEONARD BORING et al.— 276 S. W. (2d) 757.

Eastern Section. November 16, 1954.

Petition for Certiorari denied by Supreme Court, March 11, 1955.

Mayfield & Mayfield, of Cleveland, for appellant.

Corn & Bell, of Cleveland, for appellees.

McAMIS, P. J.   The bill in this case sought a mandatory injunction requiring the removal of an electrically lighted theatre sign from Lot 1 Block A of the Carrie B. Johnston Addition on the grounds (1) that it was constructed and maintained in violation of building restrictions and (2) that its maintenance constituted a nuisance. The Chancellor found for complainants as to the first ground and, accordingly, ordered the removal of the sign but found that, as maintained at the date of the final decree, the maintenance of the sign did not constitute a nuisance. Defendant Cletus Benton has appealed insisting that the erection and maintenance of the sign was not in violation of any valid restrictions on his lot and complainants have perfected a precautionary appeal from the finding of the Chancellor that the proof failed to sustain the nuisance charge.

The Chancellor's well considered opinion contains the following comprehensive and clear-cut findings:

"Complainants, June 12, 1945, acquired a parcel of land located on the South side of Harrison Pike just West of Cleveland City Limits which land is identified as Lot 2, and 5 feet of the West Side of Lot 3, in Block 'A', of the Carrie B. Johnston Sub-Division. They constructed a dwelling thereon and are residing in same.

"At the time the matters complained of arose, defendants Boring and wife were the owners of Lot 1 of said sub-division, located adjacent to and West of Complainants' property. They leased this lot to defendant Benton who erected a large 12' x 18' neon sign thereon, for the purpose of advertising and directing traffic to his drive-in theatre located to the South of the sub-division. This sign, as originally installed, and as operated when this suit was instituted provided neon lighting implemented by 'blinkers' and augmented by flood lights erected upon the ground and trained upon the sign, two from the east and two from the west.

"East of complainants' property other residential properties are located, Mrs. Murphy next door and Mrs. Moody the second door from the Owenby home. West of the lot upon which the sign is located is French Avenue which was opened and paved about the time the drive-in theatre opened. Immediately West of French Avenue is located the Pendergrass home. Across Harrison Pike immediately North of these dwellings other dwellings are located.

"Since the institution of this suit Borings have sold the sign lot to Benton and the suit has been dismissed as to Borings. Also, since the institution of this suit the blinkers have been eliminated and the flood lights have been 'hooded'. Also, panelling was placed at the bottom of the sign in an effort to blanket the flood lights located on the West and prevent same from beaming upon complainants' house.

"Upon the question of nuisance the proof is at great variance. The Owenbys whose home is only about 40 feet from the sign say it had the effect of interrupting their enjoyment and use of the property, caused them considerable embarrassment by all of the illumination made there-

from and made it impossible to sleep in the front room of their home until late hours of the night when the sign was turned off. In lesser degree, but of similar vein, Mrs. Murphy and Mrs. Moody, and Mr. Jack Parrott, the latter living directly across the pike from Owenbys, testified concerning the ill effects of the sign.

"Mr. Pendergrass, father-in-law of Benton, testified to just the opposite. Other property owners located across the pike also testified that they had experienced no impairment of their enjoyment of their property by virtue of the sign. In fact, their testimony is to the effect that the sign lot has added to the appearance of the neighborhood, it having been graded, or landscaped, etc.

"Considering all of the proof the court is of opinion that the sign as originally installed and operated constitutes a nuisance, and, as such, should be abated. It being made to appear further, however, that the nuisance effect of this sign has been remedied and possibly eliminated, the second question made by the bill becomes of paramount importance, namely, whether the erection and maintenance of this sign violates a restrictive covenant.

"Carrie B. Johnston died testate in Bradley County sometime prior to July 1944. Under the terms of her will she left certain real estate to F. E. Beard and Mae Beard Stamper. Cleveland Bank and Trust Company was named executor of her will. A proceedings was had in the Chancery Court whereby the Court ordered the executor to sell so much of the real estate as necessary to pay the indebtedness of the estate. Thus, looking to the sale of said property the Carrie B. Johnston subdivision was laid off 717 feet in length and 200 feet in width. This sub-division is located just outside the city limits of Cleveland and along the south side of Harrison Pike. It is laid out in two Blocks, ' "A" ' and ' "B" ',

separated by French Avenue. Block ' "A" ' consists of six lots and Block ' "B" ' of four lots, all of these lots are of varying widths of 60 to 100 feet with a depth of 200 feet. The sub-division is bounded on the West by Emmett Avenue and on the East by Tidewater Road. South and contiguous to the sub-division are unrestricted lands belonging to Beard and Stamper which extend 1200 feet to Lee Highway or U. S. 11. The sub-division as laid out was platted and filed for registration July 18, 1944, in the Register's Office of Bradley County but no restrictions were incorporated in this plat.

"In obedience to the Court decree the executor proceeded to sell off certain lots. The beneficiaries, Beard and Stamper, signed as grantors in each conveyance.

"The first parcel sold, June 12, 1945, was Lot 2 and 5 feet of the West side of Lot 3, Block A, to the complainants. This deed incorporated this provision:

" 'As a part of the consideration the purchasers hereby agree and bind themselves, their heirs and assigns, that any buildings or erections maintained on the said land shall be for residential purposes for members of the Caucasian race only and shall be constructed at a cost of not less than Four Thousand Dollars ($4000.00).'

"On October 1, 1945, a deed was made to E. Swartz, defendants' predecessor in title, to Lot 1, in Block A. This is the lot on which the sign is located. This deed incorporated this provision:

" 'As a part of the aforesaid consideration, the purchaser hereby agrees and binds himself, his heirs and assigns, that any buildings or erections maintained on said land shall be for residential purposes for members of the caucasian race only and that any dwelling erected or maintained on said land shall

be constructed at a cost of not less than Four Thousand Dollars ($4000.00).'

"On June 30, 1945, Lot 3 and 5 feet of the West side of Lot 4 in Block A, was conveyed to J. W. Murphy and wife Estella. This deed contained this provision:

"'It is stipulated and agreed that neither the grantees nor any successor in title, shall use said real estate or any part thereof for business or commercial purposes; and that the same shall be used for residential purposes only and by White people only; and it is further agreed, as a part of said consideration, that no residence or dwelling shall be erected or maintained on said land or any part thereof, that shall cost less than Four Thousand Dollars ($4000.-00).'

"On October 1, 1945, the balance of Lot 4, in Block A, was conveyed to Lenore Moore, and contained this provision:

"'As a part of the aforesaid consideration, the purchaser hereby agrees and binds herself, her heirs and assigns, that any buildings erected or maintained [on] said land shall be for residential purposes for members of the Caucasian Race only, and that any dwelling erected or maintained on said land shall be constructed at a cost of not less than Four Thousand Dollars ($4,000.00)'.

"On May 2, 1946, a portion of Lot 5 was conveyed to Mrs. Lenore Wood Moore. The deed contained this provision:

"'As a part of the aforesaid consideration the purchaser hereby agrees and binds herself, her heirs and assigns, that any building erected or maintained on said land shall be for residential purposes for members of the Caucasian Race only, and that any

dwelling erected or maintained on said land shall be constructed at a cost of not less than Four Thousand Dollars ($4,000.00)'.

"On July 19, 1944, Lots No 1 and 2 in Block B, were sold to Vastind F. Stickley and wife Mildred V. Stickley. The Deed contained this provision:

"'It is stipulated and provided that the Grantee nor any successor in title shall use said lots or any part thereof for business or commercial purposes, that the same are to be used for residential purposes for white people only and it is further provided as a part of the consideration that the grantees shall not erect any residence on the said lots or any part thereof that shall cost less than Five Thousand Dollars ($5,000.00) to construct.'

"On June 12, 1945, Lot 3, in Block B, was sold to W. V. Ragsdale and wife Mae Ragsdale. The deed contained this provision:

"'As part of the consideration herein the purchasers hereby agree and bind themselves, their heirs and assigns, that any buildings or erections maintained on the said land shall be for residential purpose only and shall be constructed at a cost of not less than Five Thousand Dollars ($5,000.00), and shall not be sold or conveyed to any person not a member of the Caucasian Race.'

"On June 12, 1945, Lot 4 in Block B, was conveyed to T. J. Pendergrass and wife Lola Pendergrass. The deed contained this provision:

"'As a part of the consideration the purchasers hereby agree and bind themselves, their heirs and assigns, that any buildings or erections maintained on the said land shall be for residential purposes for members of the Caucasian Race only and shall be

constructed at a cost of not less than Five Thousand Dollars ($5,000.00).'

"With exception of Lot 1, Block A, on which the sign is erected and a portion of Lot 5, and Lot 6, Block A, still retained by Grantors, residences have been erected on the various lots in this sub-division. Along Harrison Pike and fronting on the North side of same, other residences are located but these are not a part of the sub-division and are not restricted: and continuing West on Harrison Pike, both on the North and South sides, residences are erected.

"The proof indicates that the parties who built their homes on the various lots in the sub-division did so thinking that the land was restricted for such purposes only.

"While we have here in this case some variance in the restrictions incorporated in the deeds, it seems fairly certain that it was the intention of the Grantors to restrict the use of the land to residential purposes only. And if such restrictions run in favor of the various Grantees the Court will have no hesitation in invoking the rule laid down in Laughlin v. Wagner, 146 Tenn. 647 [244 S. W. 2d 475], and reaffirmed by the Supreme Court, in an opinion written by Chief Justice Grafton Green in the case of Ridley v. Haiman, 164 Tenn. 239 [47 S. W. 2d 750], wherein the Court reviewed numerous authorities on this subject."

After quoting at length from Ridley v. Haiman, supra, the opinion of the Chancellor continues:

" The Court finds that it was the intention of the parties as gathered from the written contracts, and the circumstances of the case, to restrict the lots sold in the sub-division to residential uses for benefit of both Grantors and Grantees, and their successors. This conclusion

is made all the more inevitable by the absence of proof on the part of defendant to the contrary. All of the deeds to all of the lots sold in the sub-division contained restrictive covenants; and all of the lots within the sub-division were sold except a small portion of land comprising a part of Lot 5 and all of Lot 6 which fronts 60 feet on Harrison Pike and tapers off to 30 feet in the rear which unsold portion is on the East end of the sub-division nearest town. These lots were not sold it appears because the other lots in the sub-division sold for enough to pay the debts of the estate. Thus, to conclude that the restrictive covenants were not for the mutual benefit of Grantors and Grantees, especially when one of the Grantors was a corporation, would be a little far-fetched.

"It is argued for defendant, and rightfully so, that the burden is upon Complainant to prove the fact of mutual covenant.

"But the Court finds that the complainants have carried the burden of proof and finds that it was the intention of the parties, gathered from the written contract and the circumstances of the case, to buy and sell real estate subject to restrictive covenants for the mutual benefit of both parties."

After a careful reading of the record and an examination of the controlling authorities we fully concur in the findings of the Chancellor and with the conclusion that the erection and maintenance of the sign violates the restrictive covenants of the deed. We observe that defendant Benton is not in the position of a purchaser without notice. He bought with full knowledge that complainants and others who own lots in the Johnston Addition claimed that the restriction here invoked imposed reciprocal obligations binding all lot owners to refrain

from using any portion of the property for business purposes.

■ Since Ridley v. Haiman, supra, 164 Tenn. 239, 47 S. W. (2d) 750, 753, it has been the settled rule that an intention to make restrictive covenants mutually binding upon the parties and their successors and assigns need not be spelled out within the four corners of the deed but that such intention may be gathered from the circumstance of a uniform building, improvement and development plan and from parol evidence if the deed itself is indefinite. It was there said:

"Whether a person not a party to a deed containing a restrictive covenant is entitled to enforce that covenant depends upon the intention of those who were parties thereto. A grantor has the right to impose such legal restrictions as he desires upon the property he aliens. The grantee, of course, must be apprised of the grantor's intention. The intention of the parties is to be gathered, not alone from the written contract, but, when that instrument is indefinite, such intention is to be gathered from the circumstances of the case. Mays v. St. Paul M. E. Church, 196 Ill. 633, 63 N. E. 1040; Beals v. Case, 138 Mass. 138; Hano v. Bigelow, 155 Mass. 341, 29 N. E. 628; Clark v. De Voe, 124 N. Y. 120, 26 N. E. 275, 21 Am. St. Rep. 652; Nottingham, etc., Co. v. Butler, L. R., 15, Q. B. Div., 261, 16 Q. B. Div., 778.

"The general rule is that where the owner of a tract of land subdivides it and sells the different lots to separate grantees, and puts in each deed restrictions upon the use of the lot conveyed, in accordance with a general building, improvement, or development plan, such restrictions may be enforced by any grantee against any other grantee."

In so far as Emory v. Sweat, 9 Tenn. App. 167, may be said to hold that, in order to make building restrictions binding inter sese upon all lot owners, such intention must appear in the chain of title it must be considered as overruled by Ridley v. Haiman, supra. See 164 Tenn. 258, 47 S. W. (2d) 750, for criticism of some of the language of the opinion in the Emory case which the Supreme Court seems to have regarded as unnecessary to a decision because, in that case, the original grantor was seeking to enforce the restriction. We do not think the reference to Emory v. Sweat in Central Drug Co. v. Adams, 184 Tenn. 541, 201 S. W. (2d) 682, and in Lowe v. Wilson, 194 Tenn. 267, 250 S. W. (2d) 366, had the effect of reviving the rule of Emory v. Sweat above considered. The reference in the two cases cited was to the rule that restrictive covenants will not be extended by implication alone. We note that in Lowe v. Wilson the covenant did not purport to bind the heirs and assigns of the grantee and was, therefore, held not to be a covenant running with the land but a personal agreement between the parties. Here the deeds make the covenant binding on successors in interest. Central Drug Co. v. Adams involved a personal covenant in a lease contract and is clearly inapposite here.

In this case, as the Chancellor observed, all of complainants' proof is to the effect that purchasers were made to understand that they were buying in a subdivision strictly residential. It is true there is a statement attributed to one of the original grantors, in connection with explaining the restrictions, that he intended to live nearby and that he did not want any "bootlegging joints" in the neighborhood. We think it would be too narrow a view to say that this statement evinces an intention to make the restrictions a mere personal obligation. We are of the

opinion from the context that the statement was made to assure purchasers of the fixed intention of the grantors to exclude business operations from the subdivision. There is no proof to the contrary.

■■ So, we think, the question of the correctness of the Chancellor's decision comes down to this: Does the restriction that any building erected on the land must be used for residential purposes forbid the use of the land while vacant for business uses? Though the contrary is plausibly and ably argued by defendant's counsel, we think an affirmative answer is required by the authorities. Even under the applicable rule of strict construction, it seems to us impossible to read the restrictive covenants of the deeds without concluding that the predominant purpose of the draftsman was to create an exclusively residential subdivision.

In Laughlin v. Wagner, 146 Tenn. 647, 244 S. W. 475, the deed provided that, " 'Any house erected on the Belvedere side be used for residence purposes only, * * * to be built on established house lines'." The deed to some of the lots contained somewhat different language. The Court said: "All of the deeds containing the restrictive clauses evidence a purpose to restrict this territory so as to make it a residential section."

In the concluding portion of the opinion it was said:

"From this interpretation (discussed in the preceding paragraph) it follows that the Belvedere side of this lot could not be made use of in such a way as that the manifest purpose would be to serve the business houses adjacent to it. For example, it could not be used as affording an intentional passageway or entrance into the business house. Any structure, whether strictly a house or not, such as a concrete driveway, which devotes the use of the property to

the carrying on of a business, would be violative of this clause * * *.''

This case appears with cases conforming to the view adopted by the Chancellor in an annotation at 175 A.L.R. 1196, supplementing an earlier annotation at 155 A.L.R. 528. As appears from the cases cited in these annotations there is some conflict in the decisions.

The most recent text statement appears in the 1954 Supplement to 14 Am. Jur. under Section 212.1, Covenants, Conditions and Restrictions, where it is said:

"While it is obvious that the applicability to the land itself of restrictive covenants which, although clearly applicable to, or restrictive of, the type of building which might be constructed on the land is dependent upon the peculiar phraseology of the particular covenant involved and the use desired to be made of the land, it would appear in general that covenants restricting the erection of buildings (for) other than residence purposes will be construed to prevent the use of the land itself for business purposes * * *.'' See also (Ib.) Section 212.2.

Since the injunction properly issued to enjoin a violation of the restrictions it becomes unnecessary to decide whether the maintenance of the sign constitutes an abatable nuisance.

The decree will be affirmed and the cause remanded. Costs will be taxed to defendant Cletus Benton and sureties.

Hale and Howard, JJ., concur.