**In re Richard J. TIPTON, Linda Ann Tipton, Debtors.**

**STARS OVER GATLINBURG, INC., Plaintiff and Counter-Defendant,**

v.

**Richard J. TIPTON dba Tipton Terrace Mall, Defendant, Counter-Plaintiff and Third-Party Plaintiff,**

and

**Linda Ann TIPTON, Intervening Defendant and Third-Party Plaintiff,**

v.

**Angel GARCIA dba Angel's Turquoise & Silver, et al., Third-Party Defendants,**

and

**Angel GARCIA dba Angel's Gold and Silver and Walter D. Sauer dba Old South Barbeque, Counter-Plaintiffs,**

v.

**Richard J. TIPTON dba Tipton Terrace Mall, Linda Ann Tipton, and Richard A. Sedgley, Trustee, Counter-Defendants.**

**Bankruptcy 3–80–01233.
Adv. No. 3–81–0843.**

United States Bankruptcy Court,
E. D. Tennessee.

Feb. 26, 1982.

Kennerly, Montgomery, Howard & Finley, Jack M. Tallent, II, Knoxville, Tenn., for Stars Over Gatlinburg, Inc.

John A. Walker, Jr., Knoxville, Tenn., for Richard J. Tipton and Linda Ann Tipton.

Baker, Worthington, Crossley, Stansberry & Woolf, William H. Skelton, Knoxville, Tenn., for Angel Garcia and Walter D. Sauer.

Kennerly, Montgomery, Howard & Finley, G. Wendell Thomas, Jr., Knoxville, Tenn., for Tennesco.

Richard A. Sedgley, Knoxville, Tenn., Trustee, pro se.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

This adversary proceeding was commenced October 1, 1981, by the plaintiff, Stars Over Gatlinburg, Inc., the lessee of certain property in Tipton Terrace Mall, seeking an adjudication of the rights of the plaintiff and the defendant, Richard Tipton, dba Tipton Terrace Mall, the lessor, arising from a leasehold agreement dated September 14, 1978.[1] Linda Tipton, Richard Tipton's wife, averring that she is also the developer and lessor of the property known as Tipton Terrace Mall, intervened on October 23, 1981. In an Answer, Counter-Complaint and Third-Party Complaint, also filed October 23, 1981, the Tiptons named as third-party defendants, Angel Garcia dba Angel's Turquoise & Silver, John L. Perlingero and Pamela K. Perlingero dba Gepetto's Toys and Games, Walter D. Sauer dba Old South Barbeque, Tennesco, Inc., First National Bank of Gatlinburg, and Richard A. Sedgley, Trustee. Garcia, Perlingero and Sauer are lessees of premises in the Tipton Terrace Mall. Tennesco holds a mortgage on the Mall in excess of $1,500,-000. Sedgley was appointed trustee by order of this court April 16, 1981, 11 U.S.C. § 1104. In their counterclaim the Tiptons sought a temporary injunction enjoining the named lessees from interfering with the proposed construction of a building in the common ways/common areas of the Tipton Terrace Mall. The request for a temporary injunction was denied.

The essential issue in this adversary proceeding is whether the debtors have the right to lease most of the common ways/common areas of the Tipton Terrace Mall to third parties for the purpose of constructing a Gateway Bookstore and other retail shops. Trial was held February 4 and 5, 1982.

II

Tipton Terrace Mall (the Mall) is a retail shopping mall located on the Parkway in the center of Gatlinburg, Tennessee. It is owned and operated by Richard J. Tipton and Linda A. Tipton, husband and wife, who are the debtors in a Chapter 11 Reorganization case. The Tiptons (hereafter Tipton) obtained ownership of the Cooper Court Motel in 1976, converting it since that time from a motel to a retail shopping mall. The lower level shops in the Mall were originally the Cooper Court Motel units. What is now the "common way" was originally a walkway and parking lot. The words "common areas," "common ways," and "walkways" have been used interchangably by Tipton, the tenants of the Mall, and the architects for the Mall to refer to the open areas of the Mall located adjacent to the Parkway, surrounded on three sides by shops, and developed with fountains, terraces, benches, and walkways.

In 1976 Tipton retained Birney Hand, a licensed architect, to develop plans for converting the Cooper Court Motel into retail shops. (Exhibits 1, 2, 3, and 4) Tipton wanted to create a series of boutiques and shops on the lower level, maintaining a motel on the upper level. The primary goal for the development in the center area was to get people off the street and into the Mall area, as well as to draw and attract prospective tenants. Although there was

---

1. Tipton and his wife, Linda Tipton, are debtors in a Chapter 11 Reorganization case commenced September 24, 1980.

some discussion about covering the center area, there was no discussion concerning the construction of a commercial building in the center area. Instead, Tipton wanted to expand the existing structures. Hand was aware that future development of the Mall was planned above and to the rear of the common ways and the renovated motel units and, in fact, drew plans for the proposed development.

In February 1977 the architectural firm of Goodstein, Hahn, Shorr & Associates and specifically Harold K. Hahn (Hahn) was retained by Tipton to provide drawings and plans for the Mall development. When Hahn was retained by Tipton, the first phase of the renovation of the motel units into retail shops had been completed. The parking lot and walkways had been reconstructed into the common ways as they exist today. Due to Tipton's financial condition, a master plan for the Mall was not feasible. Hahn and Tipton had general discussions regarding overall development of the Mall. At one point Hahn proposed a winding road going through the center of the Mall and up the hill to the rear. This plan was rejected by Tipton. "Bits and pieces" were added as Tipton obtained tenants. The common ways, as designed by Hand, however, were not significantly altered or modified.

In the fall of 1978, Tipton entered into a lease agreement with *Stars Over Gatlinburg, Inc.*, for the construction of a wax museum (Exhibit 21). The Stars lease provides in relevant part that Tipton as lessor leases to Stars Over Gatlinburg, Inc. (Stars), the interior area of the first two stories of a motel building located on the Mall property. The Stars lease was dated September 14, 1978, with its term to begin November 1, 1978, for twenty-five years, with additional options to renew for five additional periods of five years each, so that it has a potential term of fifty years. The draft of the Stars lease was prepared by Stars or Stars' attorney.

At the time of the execution of the lease, the center portion of the Mall, i.e., the common areas, consisted of walkways, trees, flowers, planters, and a Bomanite ground covering. Tipton's negotiations with Stars were conducted with Eric Uberman, whom he had known for several years. At one time Tipton was employed by a corporation in which Uberman is a principal. Tipton approached Uberman in early 1978 to become a tenant in the Mall. Hahn, at the request of Tipton, prepared drawings showing Stars Over Gatlinburg in the Mall as it exists today. (Exhibit 20). Hahn, thereafter, was retained by Stars to design and renovate the building in which the museum is presently located. Stars was designed by Hahn as the "focal point" of the Mall, at the top of a "grand stairway," so that it would be visible from the Parkway and the sidewalks. (Exhibit 20) According to Hahn, the view was "critical." Tipton approved and paid for the plans. Tipton did not advise Hahn and Hahn was never aware of any plans for construction in the common ways until after Stars, Sauer and Garcia (who later entered into leases with Tipton) had commenced operation of their respective businesses.

Tipton represented to Uberman that the common ways of the Mall would remain as they were; that they were there as a "draw"; that there was nothing else like it in Gatlinburg; that the cascading falls would draw people. Tipton never advised Uberman of any plans to construct a building in the center area.

Tipton's representations that Stars would be the focal point of the Mall, with visibility both from the Parkway and sidewalks, induced Uberman to enter into the Stars lease and ultimately to invest some one-half million dollars in the project. Tipton showed Uberman a drawing of the proposed project (Exhibit 17), as an aid in selling the project. According to Uberman, the grand stairway and the view from the Parkway and sidewalk were "crucial" to the project. Uberman would not have entered into the Stars lease had he known that Tipton was planning to develop the center area, thereby destroying the view of the museum from the Parkway and sidewalks.

In Paragraph 9 of the Stars lease, Tipton, as lessor, agreed "to pave and improve the walkways, fountain areas and approachways to the building as designated by the architectural plans...." Paragraph 25 contains a covenant of quiet possession— Stars Over Gatlinburg "shall and may peacefully and quietly hold and enjoy the leased premises during the term hereof or any extensions thereof. Subject, however, to the rights of others in and to the joint use of access easements to the leased premises."

After Stars opened, Uberman learned that another lessee, Wes Estabrook, had proposed extensions of certain buildings into the center areas of the Mall. Uberman objected to such extensions, claiming that the Stars lease prevented any alteration of the common ways or any construction therein. The extensions were not built. Uberman has always contended that Stars had property rights in the common ways of the Mall.

In 1981, Hahn was retained by Gateway, Inc., through Robert Werner, to design a building to be located in the common areas of the Mall. The photographs with onionskin overlays, Exhibits 14, 15, and 16, were prepared by Goodstein, Hahn, Shorr & Associates for Gateway, Inc., and are accurate protrayals of the proposed building. It is the opinion of Hahn, if the Gateway building is constructed, the view to Stars Over Gatlinburg from the sidewalks and Parkway will be blocked, as demonstrated in the photographs with the overlays. Pedestrian access will also be impeded. The Gateway plans and specifications clearly indicate that maximum space in the common area is to be utilized, leaving only a walkway on either side and in the rear.

*Angel Garcia* owns a turquoise and jewelry shop located in the lower back portion of the Mall. Garcia first became a tenant in December 1976, when he bought out a prior tenant. He negotiated this lease with Steve Clabough, brother-in-law and then an assistant to Richard Tipton. Clabough never advised Garcia that any construction was contemplated in the common areas. Garcia was shown drawings of the Mall which depicted the common ways as fountains, terraces, benches, and walkways. He was also shown plans for future development of the Mall. He was never advised nor did the plans shown to him indicate any construction in the center area. To the contrary, it was represented to him that the common areas would remain and would be available for the use and benefit of all tenants. Garcia would not have entered into the lease if he had been told that a building was planned for the common area. On December 1, 1978, Garcia entered into a second lease with Tipton for the same premises. (Exhibit 9) Garcia never became aware of any proposed construction in the common areas of the Mall until Tipton proposed to lease space to Gateway. Tipton attempted to persuade Garcia to sign a waiver allowing this construction, but Garcia refused.

*Walter D. Sauer* operates a restaurant in the Mall known as "Old South Barbeque," also located in the lower back portion of the Mall. Sauer negotiated a lease for this space with Tipton and a lease agreement was entered into on September 10, 1979 (Exhibit 26). Sauer was attracted to the Mall because of its attractive grounds, visibility of the shops from the Parkway and sidewalks, and its potential as a barbecue shop. Sauer and Tipton talked a lot. Tipton stated that the common ways were constructed as an invitation to persons to visit shops located in the Mall, the walkways creating a different traffic pattern. Sauer was shown many blueprints including drawings of the shops and common ways. Initially the space being leased by Sauer did not have sufficient seating areas for his customers and he was assured by Tipton that his customers could use the benches in the common ways to eat barbecue. At that time the construction of the common ways was completed with fountains, terraces, benches and walkways. Sauer also was assured by Tipton that the common ways would remain as they were. Tipton never advised Sauer that a building was contemplated in the center area. Sauer relied on Tipton's statements and would not have entered into the lease if Tipton had advised

him that a building was to be constructed in the center. Visibility of his shop would be virtually eliminated by the construction of the proposed Gateway building (Exhibits 14, 15, and 16).

Sauer's wife, Helen Sauer, had numerous discussions with Tipton prior to the lease being signed. Tipton never advised Mrs. Sauer of any proposed construction in the center. Instead, Tipton's representations related to continued beautification which would enhance the common ways. The fountains were specifically mentioned as attractions for people to visit the shops in the back of the Mall.

Sauer first became aware of the proposed construction in the common ways when Tipton proposed to lease space to Gateway. Tipton attempted to persuade Sauer to consent to the construction but, after negotiations, Sauer refused.

Visibility from the street and pedestrian access are important in attracting customers to Sauer's shop. The availability of the common ways for customer seating is especially crucial to Sauer's business.

Both Garcia's and Sauer's lease contain the following language:

Landlord does hereby lease to the Tenant and the Tenant does hereby lease from the Landlord on the terms and conditions hereinafter set out, the following described *property*:

SITUATE in the Eleventh (11th) Civil District of Sevier County, Tennessee, and within the City of Gatlinburg, Tennessee, and being: (1) The interior only of Shop # [110 for Garcia and 109 for Sauer] of Tipton Terrace Mall as shown on the attached plat of the shopping complex known as Tipton Terrace Mall marked Schedule A and attached hereto, together with; (2) The privilege of use of the *common ways* from Parkway providing access to said shop for the use and benefit of both Tenant and the Tenant's employees and customers. (emphasis added) (Exhibits 9, 26, page 1).

Tipton on previous occasions has allowed various parties to set up booths or tables in the Mall. Only one of those booths or tables blocked the view or impeded access to the shops of Sauer or Garcia and, upon the request of Garcia, the same was removed. Also, at one time Tipton planted a tree in the common ways which partially blocked visibility of Sauer's shop. Tipton gave Sauer permission to remove the tree, which he did.

Tipton has constructed a stairway to "Mother McGhees" restaurant but neither Sauer nor Garcia objected to the stairway since it did not impede access to their shops or block the view of their shops. (See Exhibit 22).

In May of 1980 Tipton and various tenants met to discuss complaints of the tenants regarding the maintenance of the common ways and particularly the fountains. The tenants proposed that the fountains be converted to planters. Tipton declined, stressing the value of running water for attracting customers. Thereafter, maintenance of the common ways and the fountains improved.

In the event the Gateway Building is constructed, it would substantially impede access to the shops of Sauer and Garcia, substantially block the visibility of their shops from the Parkway and the adjacent sidewalks, and substantially impede access over the common ways as that term is used in their leases.

The Sauer and Garcia leases (Exhibits 9 and 26) specifically convey to Sauer and Garcia "the privilege of use of the common ways from Parkway providing access to said shop for the use and benefit of both Tenant and the Tenant's employees and customers." The leases further contain covenants of quiet enjoyment.

In a deposition given on December 8, 1981, Tipton acknowledged that a drawing introduced as Collective Exhibit 5, and specifically page A–2 thereof, depicted the improvements to the common ways. (Pages 28 and 29, page A–2). Tipton further marked on page A–2 in red pen the approximate exterior boundaries of the proposed Gateway Bookstore to be constructed on the common ways (pages 30 and 32, page A–2).

The Sauer and Garcia leases were form leases prepared by Tipton's attorney, were executed with only minor changes that do not affect the matters in controversy, and contained no provision authorizing the construction of a building in the common area.

Jack Schaufele owns a strudel shop occupying space in the Mall. Schaufele was conveyed an interest in the "common ways" in his lease agreement (Exhibit 28). The strudel shop has no customer seating. Tipton represented to Schaufele that the benches in the common ways would be available for his customers to use while they ate products from his shop. Tipton also discussed future development of the Mall with Schaufele, indicating that such development would be on the hill and to the rear only, not in the center area.

John Perlingero owns Gepetto's Toy and Game Shop occupying space in the Mall. Perlingero's lease contains a conveyance of an interest in "common ways" (Exhibit 27). Although there was never any specific discussion with Tipton concerning construction of a building in the common ways, Tipton intimated that a building would not be constructed in that area. Perlingero was given the impression that the common ways of the Mall would remain as they existed at the time he signed his lease.

Tipton, in a *pro forma* history of the Mall and projected development which was submitted with a loan application, did not mention any further development of the common ways (Exhibit 30). Nor does Tipton have any drawings or plans which depict development of a building on the common ways, prior to the proposed construction of the Gateway building.

In a letter dated October 10, 1980, (Exhibit 25) Tipton advised tenants of the Mall that the maintenance of the common ways would be enhanced so that the common ways would "...continue to be one of the most beautiful properties in Gatlinburg, and the most highly photographed area of the city, as it has been in the past."

III

Tipton's lack of adequate capital since his purchase of Cooper Court in 1976 is the root of his present problems.[2] He has relied almost entirely on financing. He needed tenants to convert the motel to a shopping area. He conceived the idea of a Mall with flowers, trees, water and walkways in the center area that would attract tenants and customers to the Mall. This Court has not the slightest doubt but that Tipton's initial concept was to make the center area an attractive and permanent feature of the Mall, with future expansion limited to the hill and back areas. Tipton made certain choices, one being to enter into long-term leases. To induce tenants to enter into these leases, including Uberman, Garcia, Sauer, and others, Tipton expressed the concept of the center Mall not only by words but by exhibiting plats and drawings, with the full expectation that his plans could be carried out. Economic realities intruded, however. Cash flow was wholly inadequate to support his debt structure. Foreclosures became imminent. Resort to a Chapter XII proceeding under the former Bankruptcy Act on February 3, 1978, resulted in temporary relief only. In a last desperate effort to retain control and prevent liquidation, he (or others) conceived the idea of constructing a building in the center area, only to run afoul of concepts that he previously had expressed and leases that he previously had entered into. He has made peace with most of the tenants, but not with all. Those tenants who have not assented to the construction of the proposed building in the center area, including Stars, Garcia, and Sauer, have the legal and equitable right to expect Tipton to live up to his commitments, as expressed in the leases supported by the conclusive evidence introduced at the trial of this cause. In retrospect, the choices freely made by Tipton in negotiating leases have proven less favor-

---

**2.** Schedules filed by Tipton in the Chapter 11 case indicate secured indebtedness exceeds $2,700,000; unsecured indebtedness, $68,-000.00.

For a history of the debtors' business, see Part II, First Amended Disclosure Statement, filed November 6, 1981.

able than choices he could now make were he free of his prior commitments.[3] Nor does that evidence conflict with the parol evidence rule, as Tipton insists. Parol evidence is admissible to explain unclear terms or to establish a prior or contemporaneous agreement between the parties, which is collateral as opposed to contradictory, or to determine the meaning of contract terms, *Haynes v. Morton*, 32 Tenn.App. 251, 222 S.W.2d 389 (1949); *Kroger Co. v. Chemical Securities Co.*, 526 S.W.2d 468 (Tenn.S.Ct. 1965). Garcia's and Sauer's leases refer to "common ways," "grounds," "prohibited uses of common ways." Stars' lease refers to "access," "walkways, fountain areas and approachways." Further, Tennessee courts have consistently held that parol evidence is admissible to show the parties' intent to make a mutually binding restrictive covenant, or to show an intent to restrict the use of property to a general development plan. See *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904 (Tenn.S.Ct.1976); *Owenby v. Boring*, 38 Tenn.App. 540, 276 S.W.2d 757 (1954); *Ridley v. Haiman*, 164 Tenn. 239, 47 S.W.2d 750 (1932).

 If Tipton knew that he always intended to develop the common area of the Mall by the construction of commercial buildings, as he now insists, he failed to advise prospective tenants of that intention. This was especially pertinent to Stars, visibility of the museum from the Parkway and sidewalks being "crucial." The same is true as to Sauer, the use of the common ways being essential for customer seating. The silence of one upon whom it is incumbent to speak concerning *material* matters "entirely within his knowledge" constitutes fraud under the laws of this state. *Simmons v. Evans*, 185 Tenn. 282, 206 S.W.2d 295 (1947). "(T)he intention to defraud may be proven by acts, conduct and circumstances *or by the silence of one upon whom it is expressly incumbent to speak concerning material matters which are within his own knowledge.*" *Vela v. Beard*, 59 Tenn.App.

544, 442 S.W.2d 644 (1968). If Tipton had plans that would alter or change the access, visibility, or use of the common area by prospective tenants that was contrary to the plans, drawings, and pictures shown to those tenants, he was under a positive duty to disclose those plans.

 Tipton insists that denial of his right to construct the proposed building in the center area will result in failure of any Chapter 11 plan that he can propose. As pointed out by the tenants involved in this proceeding, however, that issue is not before this Court. The issue is whether Tipton by his prior acts and deeds has vested Garcia, Sauer, and Stars with property and possessory rights which he now seeks to avoid. In other words, can Tipton now deprive Garcia, Sauer, and Stars of those possessory interests or deprive them of leasehold estates in the common ways, freely and voluntarily transferred to them? This Court concludes that he cannot. A proceeding under Chapter 11 recognizes not only the rights of the debtor but also the rights of others with whom the debtor has voluntarily contracted (preferential and fraudulent transfers, of course, excepted).

Nor is the issue whether Tipton proposes to "cause a quality building" to be constructed in the center area, or whether such building would "attract" more people to the Mall. This Court has no doubt but that Gateway would construct a quality and attractive building and that it has the financial resources to do so. The question presented, however, is whether Tipton's proposed lease to Gateway encroaches upon property rights that he previously has assigned and transferred to others.

Many debtors in bankruptcy cases find themselves in precarious straits when future events disclose that they previously have entered into contracts less favorable than the current market would bear. This fact, however, does not justify a court de-

---

**3.** Tipton's proposed lease with Gateway would net him $150,000 immediately, with additional rentals of $60,000–$75,000 annually for the next twenty-five to thirty-five years. See pro-

posed Lease attached as Exhibit 2 to debtors' Answer, Counter-Complaint, and Third-Party Complaint, filed October 23, 1981.

clining to enforce binding agreements, knowingly and legally made and entered into.

### IV

The lease agreements between Richard J. Tipton and wife, Linda Tipton, dba Tipton Terrace Mall, and Stars Over Gatlinburg, Inc., Angel Garcia, and Walter Sauer convey to Stars, Garcia and Sauer a possessory interest, an interest in land, and an easement in the common areas, common ways, and walkways in the Tipton Terrace Mall as defined by Richard J. Tipton in Exhibit A–2, Tipton's deposition, December 8, 1981.

Stars' possessory or property 'nterest in the common areas, common ways, and walkways is derived from:

(1) Two sources in the lease:

(i) Paragraph 7 of the lease whereby the lessor agrees "to pave and improve the walkways, fountain areas and approachways to the building as designated by the architectural plans...."

(ii) Paragraph 25 of the lease whereby the lessor covenants to the lessee that it "shall and may peacefully and quietly hold and enjoy the leased premises during the term hereof or any extensions thereof. Subject, however, to the rights of others in and to the joint use of access easements to the leased premises."

Under this clause, Stars was granted an easement in the common areas of the Mall by virtue of Tipton's definition of the common ways or common areas. Exhibit A–2, Tipton's deposition, December 8, 1981. The easement in the common areas is a property interest in those common areas. Additionally, this clause is a covenant of quiet enjoyment which is an integral part of Stars' leasehold estate. A breach of this covenant of quiet enjoyment would effectively dispossess Stars of portions of its estate premises.

(2) Two sources outside the lease:

(i) Tipton Terrace Mall was developed according to a development scheme as evidenced by the architectural plans, drawings, and renderings of the Mall. In addition, the leases of other tenants which have come before the court include an express conveyance of an interest in common ways. Tipton defined the common ways conveyed in the leases to be the property called the common area. The fact that the Mall was developed according to these plans binds Tipton to a reciprocal restrictive covenant. Both the lessor and the lessees have impliedly agreed to conform to the obvious development scheme.

(ii) Tipton represented to the owners, agents, or officers of Stars through drawings, plans and other graphic material, as well as by oral statements, that the common areas of the Mall would remain and that the view and access to Stars would not be obstructed. Tipton knew that the view of Stars' museum from the sidewalks and Parkway was crucial. Tipton is bound by his representations and is estopped to deny that he created a property interest in favor of Stars.

The construction of the proposed Gateway building would dispossess Stars of its possessory interest. It would impede ingress and egress to Stars' premises and would, for the most part, eliminate visibility of the museum from the sidewalks and Parkway. Accordingly, the proposed building may not be constructed so long as Stars objects.

Sauer's and Garcia's possessory or property interest in the common areas, common ways, and walkways is derived from the following:

(1) The specific language of the respective leases of Sauer and Garcia conveying to them "...(t)he privilege of use of the common ways from the Parkway providing access to said shop for the use and benefit of both Tenant and the Tenant's employees and customers." The common ways, as used in Sauer's and Garcia's leases, refer to the open areas of the Mall located adjacent to the Parkway, surrounded on three sides by shops, and developed with fountains, terraces, benches, and walkways.

(2) The covenant of quiet possession contained in Paragraph 33 of the respective leases.

(3) The development scheme for the Mall, which was consistently followed by Tipton, utilized the common ways as a means of attracting customers to the Mall.

(4) The representations of Tipton and his agents to Sauer and Garcia and others that the common ways would not be further developed and that buildings would not be constructed thereon.

Tipton conceded that the common ways as conveyed to Sauer and Garcia by their respective leases would be substantially blocked and obstructed, from both an access and visual standpoint, by the construction of the proposed Gateway building. Such blocking and obstruction would impair Sauer's and Garcia's interests in the common ways. The proposed building may not be constructed so long as Sauer or Garcia object.

■ Tipton submitted no evidence regarding the Third-Party Complaint against Tennesco whereby Tipton seeks to require Tennesco to execute a "non-disturbance agreement" in accordance with Paragraph 3 of the "Agreement to Lease" between Tipton and The Gateway, Inc., a copy of which is attached as Collective Exhibit 2 to the Third-Party Complaint.

Paragraph 3 reads as follows:

3. *Attornment and Non-Disturbance.* It is a condition precedent to execution of lease that Lessee shall have received evidence satisfactory to Lessee's counsel that in the event of a foreclosure of any deed of trust on the demised premises, Lessee may remain in peaceful possession under the Lease as long as Lessee continues to comply with the terms of the Lease and will not be disturbed during the term thereof as extended.

Having failed to sustain any basis for granting the relief requested, the complaint against Tennesco must be dismissed. *In re Burton*, 4 B.R. 608 (W.D.Va.1980); *Koehler v. Marcona Mining Co.*, 391 F.Supp. 1158 (N.D.Cal.1973); *Edwin F. Armstrong & Co. v. Ben Pearson, Inc.*, 294 F.Supp. 163 (E.D. Ark.1967).

V

■ In the Answer, Counter-Complaint and Third-Party Complaint filed October 23, 1981, Tipton prays that, in the event the Court finds that third-party defendant tenants have certain rights with respect to development which would prohibit the construction of the proposed Gateway building, the debtor be authorized to reject the leases. Paragraph VIII of the debtors' First Amended Plan of Reorganization of September 3, 1981, also provides that the leases of all tenants of Tipton Terrace Mall who do not consent to the construction of the Gateway building "shall be rejected."

In the briefs filed by the parties in this adversary proceeding, they have discussed at length the debtors' right to reject the leases. Section 365 of Title 11, United States Code, authorizes the trustee, subject to the Court's approval, to assume or reject any executory contract or unexpired lease of the debtor. § 365(a). Section 1123(b)(2) provides that, subject to § 365, a plan may provide for the assumption or rejection of an executory contract or unexpired lease of the debtor.

The trial that was held in this proceeding focused upon the rights of the parties under the leases, not whether the debtor should be permitted to reject those leases. The Court, therefore, declines to make any determination at this time as to whether the debtor has the right to reject the leases,[4] and, if such right exists, whether the debtor should be permitted to reject the leases. Those matters will be determined hereafter, either when the debtor formally proposes to reject one or more of the leases or at the hearing on confirmation of the debtors' plan.

---

4. Tennesco challenges that right, alleging that, since a trustee has been appointed, the right may be asserted only by the trustee.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

Submit Judgment accordingly.