# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 6, 2013 Session

## ALEXANDER A. STRATIENKO, M.D. v. CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY, ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 04C1497     Jacqueline S. Bolton, Judge**

---

**No. E2011-01699-COA-R3-CV - Filed November 21, 2013**

---

Over nine years of litigation in both state and federal courts has stemmed from a 2004 incident ("the Incident") wherein Alexander A. Stratienko, M.D. ("Plaintiff") pushed Van Stephen Monroe, Jr., M.D. while in a staff break room at Erlanger Hospital ("the Hospital") in Hamilton County, Tennessee. In this appeal, Plaintiff raises issues regarding whether the Trial Court erred in granting partial summary judgment to Chattanooga-Hamilton County Hospital Authority, in not allowing another amendment to the complaint and additional discovery, in excluding claims at trial relative to an administrative hearing, and in holding that Plaintiff failed to prove at trial intentional interference with business relations. We find no error in the Trial Court's judgments and, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

John P. Konvalinka, Mathew D. Brownfield, and Thomas M. Gautreaux, Chattanooga, Tennessee, for the appellant, Alexander A. Stratienko, M.D.

Fred H. Moore, Joseph R. White, and James H. Payne, Chattanooga, Tennessee, for the appellee, Chattanooga-Hamilton County Hospital Authority.

# OPINION

## Background

This case has an extensive procedural history having been before not only this Court previously, but also our Supreme Court, the United States District Court for the Eastern District of Tennessee ("District Court"), and the United States Court of Appeals for the Sixth Circuit. We need not discuss in detail in this Opinion the underlying facts of the suit as they have been discussed in detail in the several appellate opinions already issued in this case and any such further discussion is unnecessary to our resolution of this appeal. Further details on the underlying facts can be found in *Alexander A. Stratienko, M.D. v. Chattanooga-Hamilton County Hospital Authority*, Nos. 09-5334, 09-5485, 09-6005, 402 Fed. Appx. 990, 2010 U.S. App. LEXIS 23746 (6th Cir. Nov. 17, 2010); *Alexander A. Stratienko, M.D. v. Chattanooga-Hamilton County Hospital Authority*, No. 1:07-CV-258, 2009 U.S. Dist. LEXIS 60750 (E.D. Tenn. July 16, 2009); *Alexander A. Stratienko, M.D. v. Chattanooga-Hamilton County Hospital Authority*, No. 1:07-CV-258, 2009 U.S. Dist. LEXIS 21683 (E.D. Tenn. March 17, 2009); *Alexander A. Stratienko, M.D. v. Chattanooga-Hamilton County Hospital Authority*, 226 S.W.3d 280 (Tenn. 2007); *Alexander A. Stratienko, M.D. v. Chattanooga-Hamilton County Hospital Authority*, No. E2005-01043-COA-R9-CV, 2006 Tenn. App. LEXIS 161 (Tenn. Ct. App. March 8, 2006).

This case is currently before us after being remanded from the District Court to the Trial Court. Upon remand to the Trial Court, Mitchell L. Mutter, M.D., Daniel F. Fisher, M.D., and Nita Shumaker, M.D. filed a motion for summary judgment. The Trial Court granted Mitchell L. Mutter, M.D., Daniel F. Fisher, M.D., and Nita Shumaker, M.D. summary judgment, and these parties are not involved in this appeal.

The Hospital also filed a motion for summary judgment. By order entered on February 16, 2011, the Trial Court granted the Hospital partial summary judgment on Plaintiff's claims of breach of contract, inducement of breach of contract, conspiracy, and immunity. The case proceeded to trial on Plaintiff's sole remaining claim of intentional interference with business relations.

At trial, Daniel Franklin Fisher, Jr., M.D. testified that he was the Chief of Staff at the Hospital in 2004. Dr. Fisher testified that Dr. Monroe had a contract with the Hospital to evaluate potential kidney transplant patients for cardiology issues. He stated that even if a patient was being seen by one of Dr. Monroe's partners, the patient still would have to be seen by Dr. Monroe "because we have deemed him to have special - - special insights into their problems and we want clearance from him, . . ." prior to a transplant. Dr. Fisher further testified:

our routine, and we don't vacillate from it, is to send all these patients, regardless of what kind of cardiology background they have, regardless of what doctor they've seen, regardless of who their cardiologist is, we send them all to Dr. Monroe for a cardiology evaluation, specifically asking the question, are they a candidate to go on the list for a kidney transplant operation.

Dr. Fisher explained that the patients are evaluated by Dr. Monroe and then "go back to their original cardiologist for routine treatment or longitudinal follow-up."

Dr. Fisher agreed that he and Plaintiff had talked and had "a general agreement that he would try to follow his patients and I would try to follow mine." Dr. Fisher testified that at some point in time after he and Plaintiff reached this agreement, Dr. Fisher began referring patients to Dr. Monroe. Dr. Fisher could not recall specifically the time period during which these referrals occurred. He testified:

Now, I've had patients that tell me that they want to go in another direction and, you know, that happens to me, and I'm sure it's happened to Dr. Stratienko. I'm sure it's happened to Dr. Monroe. It's happened to Dr. Twiest who used to be sitting in that audience. I mean, we've all had patients that, for one reason or another, decide they don't want to continue to see us if they need that speciality, and so they go to another doctor in the same speciality, and there have been times that a patient will tell me, I want to leave Dr. X, but I need an orthopaedic surgeon and so I want to go to Y in the same speciality, and I help them to go see Y. I mean, that kind of stuff happens all the time. It happens to everybody. There are personality conflicts. There are other issues that occur. And for that reason, sure, there are patients that will wander from Dr. A to Dr. B to Dr. C. That happens all the time in medicine. Probably happens in law too.

Van Stephen Monroe, Jr., M.D. testified that at the time of the Incident he worked for The Cardiovascular Group, which was also known as Chattanooga Heart Institute. Dr. Monroe had a contract to do cardiac evaluation of pre-kidney transplant patients and follow-up longitudinal care on post-transplant cardiac patients for the Hospital. He testified:

As part of the protocol, if it was somebody else's patient, whether it be one of my partner's patients, whether it be another practicing cardiologist in town's patient, or whether it was an out-of-town cardiologist's patient, I would do the initial evaluation, and the transplant program's intent was that there's consistency as there's varying levels of pretesting and evaluation that goes on,

-3-

depending upon the cardiologist, the group, et cetera. That's just the art of medicine.

And so, the transplant committee and a lot of the national organizations felt that having a unified approach to transplantation approval that a patient is a candidate tended to have better long-term outcomes, and so the process would be, if it was my patient, obviously, I'd see them and make a recommendation, yes or no. I don't make the approval. If there was another cardiologist's patient, I would see them for my recommendations to the transplant committee, and they recognized that I would not take over that patient's cardiac care, and that I would see them once a year unless there was something that happened as a medical event that would change their transplantation candidacy, so I was not - - I did not take over all their cardiologists' cardiac care.

Dr. Monroe agreed that he would see Plaintiff's patients through the kidney transplant program, but he assumed that the patient would go back to Plaintiff for ongoing cardiac care. When asked if any patients had refused to allow him to do the cardiac evaluation Dr. Monroe stated: "perhaps there have been. I don't recall specifically."

Melvin Wayne Twiest, M.D. testified that he was not aware of any instance from September 20, 2004 to the time of trial where Plaintiff could not treat a patient at the Hospital or anywhere else due to this lawsuit .

Patricia Eller testified that she has been the Medical Staff Affairs Coordinator at the Hospital since 1980. Ms. Eller holds a Master's Degree. She testified that reappointment letters are not available for public review as they are considered part of the peer review process. Ms. Eller testified that a moratorium was placed on carotid stenting in March of 2005, and was lifted in June of 2005. This moratorium extended to radiologists, vascular surgeons, and cardiologists. Ms. Eller stated that there were physicians other than Plaintiff who were doing carotid stenting in 2004.

Plaintiff testified at trial that he was the only physician doing carotid stenting in the cardiac cath lab at the Hospital in June of 2004. He admitted that other cardiologists were performing carotid stents in other parts of the country in 2004. When asked if anyone else in Chattanooga was doing carotid stenting at that time, Plaintiff stated: "By that time, the vascular surgery group had hired a couple of young fellows with contemporary training who were doing it, and Blaise Baxter, a well-qualified neurologist was doing it, so yes. . . . No other cardiologists, period." Plaintiff was asked how his patients would be effected if carotid stenting could not be done in the cath lab, and he stated:

Well, I couldn't treat them. If that was their best option, I would either have to offer them a less good option, such as carotid endarterectomy, if I could find a surgeon who would be willing to perform it, or send them elsewhere to have it done. There was no other option other than Erlanger for me at that time.

When asked what the implications would have been if carotid stenting were not approved by the FDA, Plaintiff stated:

If it were not approved by the FDA, it would have continued as a, quote, off-label application, using technology that was not particularly intended for use in the neck artery, as we'd been doing prior to 2004.

But with the FDA approval, a device was marketed and commercialized that was specifically intended for use in the carotid arteries, with the restrictions that they defined in 2004. Subsequent change, I should add.

Plaintiff testified that he again began doing carotid stenting once the moratorium was lifted. He was asked about patients during the moratorium, and he stated: "Well, one patient I referred to Birmingham. I was very concerned about his crescendo symptoms. And another patient sought a solution on her own, elsewhere."

Plaintiff testified that prior to November of 2006 he received referrals from the Hospital and stated that after that time he "got virtually no referrals from Erlanger." When asked if it was his opinion that one of the causes of the decline in his income was the adverse effect of what the Hospital had done, Plaintiff stated: "Unequivocally." Plaintiff was questioned about the decline in referrals, and he stated:

There was a decline in 2004 and then a dramatic decline in 2006. There was some rebound thereafter, but a very big decline in 2010 again. And my impression is that there's not been much change in 2011, but I could be wrong because I don't have figures in front of me.

Plaintiff agreed that referrals come, in part, due to relationships with patients and other doctors and that it is important to have good relationships with these people because they play a part in determining whether referrals are given. With regard to referrals after the Incident Plaintiff stated:

Well, it's very hard to say because a lot of doctors would come up to me in the hallway and say, go for it, encourage me to carry the fight against Erlanger or against what they perceived as medical staff improprieties, so a lot of doctors

started to make referral after the lawsuit because they saw me as a champion of the cause.

Others that were referring, for example, stopped entirely because of the lawsuit or because of the suspension.

Plaintiff was asked if he knew of any instance where a patient going through the Hospital's kidney transplant program was not referred to Dr. Monroe, and he stated: "I know of one that was referred to Dr. Monroe who refused to see him and then had his evaluation with me, and they accepted it."

Plaintiff agreed that income in a medical practice such as his could go up or down for a number of reasons including the economy, insurance reimbursements, and "[y]ou can stop getting patients in the front door." He also agreed that his tax returns show that his gross revenues from 2004 were $1,778,242, and that his gross revenues for 2005 went up to $1,821,191, and then down in 2006 to $1,630,039. Plaintiff was asked if he could state why his income went up from 2004 to 2005 and then down from 2005 to 2006, and he stated: "I can speculate." He then stated: "Partial answer. We added additional office space procedures in 2004 and 2005, that otherwise, the procedure would have been done in the hospital. In 2006, we just weren't as busy." Plaintiff stated that he considered his reappointment letter of 2008 to be a "conditional privileging," but admitted that it did not prevent him from doing anything thereafter.

Eugene Bruce Hutchinson, an economic consultant, testified as an expert witness for Plaintiff. Mr. Hutchinson estimated the economic loss to Plaintiff as a result of Plaintiff's loss of privilege after the Incident. Mr. Hutchinson testified that he did not take into account Plaintiff's profession when calculating Plaintiff's work life expectancy, but instead used a standard work life expectancy for a male of Plaintiff's age.

Mr. Hutchinson never was told how Plaintiff's compensation from Plaintiff's corporation was calculated, but instead he assumed that all income paid to Plaintiff was reported on Plaintiff's income tax returns. Mr. Hutchinson made no effort to determine the number of procedures performed by Plaintiff each year for the years calculated. When asked, Mr. Hutchinson admitted that the number of procedures performed by the physicians in Plaintiff's company could impact the amount of revenue generated by the company. Mr. Hutchinson did nothing to determine the amount of revenue generated per procedure, but admitted that this information could affect the profits of the corporation, which would, in turn, affect the amount paid to Plaintiff.

Mr. Hutchinson admitted that during the period from 2001 through 2003, prior to the Incident, Plaintiff's income declined. Mr. Hutchinson did not take into consideration economic conditions in the Chattanooga area or competition from other physicians and how these factors may have influenced Plaintiff's income.

Mr. Hutchinson testified that he assumed that the difference in Plaintiff's income prior to his loss of privileges as a result of the Incident and his income afterward was the result of Plaintiff's loss of privilege in September of 2004. He also testified that he assumed that the impact of Plaintiff's suspension never would go away. Mr. Hutchinson did no investigation to determine if this was so and if there actually was a relationship between these things. He also admitted that he did no research to determine if there were other factors that may have influenced a decrease in Plaintiff's income. Mr. Hutchinson testified that his understanding was that Plaintiff's loss of privilege was "very brief," and admitted that he did not know if Plaintiff had privileges to practice at any other hospitals.

After trial the Trial Court entered its order on July 26, 2011 finding and holding, *inter alia*, that Plaintiff had failed to prove any of the requisite elements of intentional interference with business relations, and entering judgment in favor of the defendants. Plaintiff appeals to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises four issues on appeal: 1) whether the Trial Court erred in granting partial summary judgment to the Hospital; 2) whether the Trial Court erred in not allowing another amendment to Plaintiff's complaint and additional discovery; 3) whether the Trial Court erred in excluding at trial Plaintiff's claims concerning the administrative hearing; and, 4) whether the Trial Court erred in finding and holding that Plaintiff failed to prove at trial his intentional interference with business relations claim.

We first consider whether the Trial Court erred in granting partial summary judgment to the Hospital. Our Supreme Court reiterated the standard of review in summary judgment cases as follows:

> The scope of review of a grant of summary judgment is well established. Because our inquiry involves a question of law, no presumption of correctness attaches to the judgment, and our task is to review the record to determine whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Cent. S.*, 816 S.W.2d 741, 744 (Tenn. 1991).

A summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993). The party seeking the summary judgment has the ultimate burden of persuasion "that there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Id*. at 215. If that motion is properly supported, the burden to establish a genuine issue of material fact shifts to the non-moving party. In order to shift the burden, the movant must either affirmatively negate an essential element of the nonmovant's claim or demonstrate that the nonmoving party cannot establish an essential element of his case. *Id*. at 215 n.5; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 (Tenn. 2008). "[C]onclusory assertion[s]" are not sufficient to shift the burden to the non-moving party. *Byrd*, 847 S.W.2d at 215; *see also Blanchard v. Kellum*, 975 S.W.2d 522, 525 (Tenn. 1998). Our state does not apply the federal standard for summary judgment. The standard established in *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998), sets out, in the words of one authority, "a reasonable, predictable summary judgment jurisprudence for our state." Judy M. Cornett, *The Legacy of Byrd v. Hall: Gossiping About Summary Judgment in Tennessee*, 69 Tenn. L. Rev. 175, 220 (2001).

Courts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). In making that assessment, this Court must discard all countervailing evidence. *Byrd*, 847 S.W.2d at 210-11. Recently, this Court confirmed these principles in *Hannan*.

*Giggers v. Memphis Housing Authority*, 277 S.W.3d 359, 363-64 (Tenn. 2009).

Plaintiff argues in his brief on appeal that there are disputed facts regarding the Incident, the investigation of the Incident, and the subsequent suspension of Plaintiff, and because of these disputed facts the Trial Court should not have granted partial summary judgment to the Hospital on Plaintiff's claims of breach of contract, inducement of breach of contract, conspiracy, and immunity. The Sixth Circuit, however, affirmed the District Court, which made findings of fact relative to the Incident, the investigation, and the suspension. What Plaintiff sought to have the Trial Court do, and now seeks to have this Court do, is revisit the facts and make new findings of fact contrary to those found in the

District Court and the Sixth Circuit, which would allow Plaintiff, in essence, another bite at the apple. In short, Plaintiff argues that the same facts can be found to be one way in the federal court's part of this lawsuit and then later can be found to be a different and inconsistent way in the Tennessee court's part of this lawsuit. We disagree with Plaintiff.

The findings of fact made by the District Court and affirmed by the Sixth Circuit Court of Appeals constitute the law of the case. As our Supreme Court has explained:

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. 5 Am. Jr. 2d *Appellate Review* § 605 (1995). In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. *Life & Casualty Ins. Co. v. Jett*, 175 Tenn. 295, 299, 133 S.W.2d 997, 998-99 (1939); *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 90 (Tenn. App. 1996). The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. *Ladd*, 939 S.W.2d at 90 (citing other authority). The doctrine does not apply to dicta. *Ridley v. Haiman*, 164 Tenn. 239, 248-49, 47 S.W.2d 750, 752-53 (1932); *Ladd*, 939 S.W.2d at 90.

* * *

> There are limited circumstances which may justify reconsideration of an issue which was issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Memphis Pub. Co. v. Tennessee Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted). None of the enumerated limited circumstances which may justify reconsideration of issues are applicable in the case now before us.

The District Court found facts with regard to the Incident, the investigation of the Incident, and Plaintiff's suspension. These findings were affirmed by the Sixth Circuit Court of Appeals and are the law of the case in this particular case. We will not reconsider

these facts. As there are no genuine issues of material fact relevant to those claims and the Hospital was entitled to judgment as a matter of law under those undisputed material facts, we find no error in the Trial Court's grant of partial summary judgment to the Hospital.

We next consider whether, as Plaintiff framed the issue: "[T]he trial court erred in not allowing an amendment and the additional discovery requested pursuant to Rule 56.07, in its Order of December 22, 2010." In its entirety, the Trial Court's order of December 22, 2010 provides:

> The Plaintiff Alexander A. Stratienko, M.D. ("Plaintiff") having announced that the Motions for Summary Judgment filed by Defendants Mitchell L. Mutter, M.D.; Daniel F. Fisher, M.D.; Nita Shumaker, M.D.; and Mel Twiest, M.D. in his individual capacity are well-taken and that Plaintiff is no longer in opposition to those motions, and for good cause shown, this Court hereby ORDERS, ADJUDGES, and DECREES as follows:
>
> 1. The Motions for Summary Judgment filed by Defendants Mutter, Fisher, Shumaker, and Twiest in his individual capacity are hereby GRANTED;
> 2. All remaining claims asserted by Plaintiff against Defendants Mutter, Fisher, Shumaker, and Twiest in his individual capacity are dismissed with prejudice; and
> 3. Court costs shall be reserved for a later determination.

Nowhere in the December 22, 2010 order does the Trial Court refuse to allow any amendment or any additional discovery.

We have reviewed the transcript of the hearing, which led to the Trial Court's entry of the December 22, 2010 order and have determined that during that hearing the Trial Court did not hear any argument regarding any proposed amendment or additional discovery. Instead, during this particular hearing Plaintiff's counsel announced that the Hospital had filed a motion to consolidate and a motion for summary judgment and that Plaintiff had filed a motion to amend, and suggested that the Trial Court rule on the motion to consolidate and the motion to amend prior to ruling on the motion for summary judgment. Plaintiff's counsel then stated that he was "not really prepared to argue the motion to consolidate today."

With regard to this issue in his brief on appeal, Plaintiff argues that "granting Plaintiff leave to file the proposed Third Verified Amended Complaint would have allowed Plaintiff to fully set forth the relevant and necessary factual allegations against Defendants, to fully and succinctly state his claims against Defendants, and to sufficiently explain why

all of Plaintiff's claims have been timely filed." Plaintiff provides no citation to the record regarding his proposed Third Verified Amended Complaint or to the Trial Court's decision with regard to Plaintiff's motion to file this amendment. Plaintiff's brief then asserts that "By Order of September 22, 2009, the trial court denied Plaintiff's request for additional discovery." (citation to the record omitted).

The Trial Court's order entered on September 22, 2009 provides, in pertinent part:

Before the Court are Plaintiff's Motion to Amend, Plaintiff's Motion for Discovery and Other Relief Pursuant to Rule 56.07, . . . .

* * *

The Court has read the various motions, memoranda in support thereof, and responses thereto. The Court denies the Motion to Amend. The Court has reviewed in detail the previously filed complaints and the proposed third amended complaint. The Court specifically finds that there are no new claims Plaintiff seeks to assert which were not known or should have been known at least by the time of the filing of the Second Amended Complaint in District Court.

The Court further notes that when this case was removed to District Court, the Scheduling Order entered required an amendment deadline of May 30, 2008. Plaintiff originally attempted to file an amendment in District Court and subsequently withdrew the amendment. This Court believes that is telling as to the true motivation behind this attempt to file yet a third amended complaint.

The Court finds the proposed amendment to be futile, untimely and would be prejudicial at this late stage of the proceedings.

Further, the Court has considered the Plaintiff's request to conduct further discovery before responding to the pending Motions for Summary Judgment filed by the Defendants. The Court is unpersuaded to allow further discovery.

Apparently, Plaintiff's allegation of error with regard to the denial of his last attempted amendment and additional discovery should have referred to the Trial Court's September 22, 2009 order and not the Trial Court's December 22, 2010 order. Furthermore,

Plaintiff provides no citation in his brief within his argument regarding his proposed Third Amended Complaint either to his proposed amendment or to the Trial Court's disposition with regard to this motion.

Our Supreme Court instructed in *Hodge v. Craig*:

An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7). *See Baugh v. Novak*, 340 S.W.3d 372, 381 (Tenn. 2011); *Sneed v. Board of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010).

*Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). In *Adams v. Gardino* this Court recently stated:

This Court will not blindly search the record to determine if any errors were committed. *See Owen v. Long Tire, LLC*, No. W2011-01227-COA-R3-CV, 2011 Tenn. App. LEXIS 678, 2011 WL 6777014, at *4 (Tenn. Ct. App. Dec. 22, 2011) ("this Court is not charged with the responsibility of scouring the appellate record for any reversible error the trial court may have committed"). "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

[P]arties must thoroughly brief the issues they expect the appellate courts to consider. This principle is reflected in Tenn. R. App. P. 13(b) which provides that, with the exception of issues involving the subject matter jurisdiction of the trial and appellate courts, appellate review "generally will extend only to those issues presented for review." Thus, appellate courts may properly decline to consider issues that have not been raised and briefed in accordance with the applicable rules. *See State ex rel. D'Amore v. Melton*, 186 Tenn. 548, 550, 212 S.W.2d 375, 376 (1948).

*Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009). "We have previously held that a litigant's appeal should be dismissed where his brief does not comply

with the applicable rules, or where there is a complete failure to cite to the record." *Commercial Bank, Inc. v. Summers*, No. E2010-02170-COA-R3-CV, 2011 Tenn. App. LEXIS 382, 2011 WL 2673112, at *2 (Tenn. Ct. App. July 11, 2011).

*Adams v. Gardino*, W2011-00773-COA-R3-CV, 2012 Tenn. App. LEXIS 644, at **4-6 (Tenn. Ct. App. Sept. 17, 2012), *Rule 11 appl. perm. appeal denied Jan. 22, 2013*.

Plaintiff's brief comes dangerously close to waiver of the issue Plaintiff attempted to raise on appeal regarding his proposed amendment and additional discovery. As we have been able, however, to determine the substance of the issue without need of scouring the record on appeal, we will address the issue.

Our Supreme Court has instructed:

> The grant or denial of a motion to amend a pleading is discretionary with the trial court. *Harris v. St. Mary's Med. Ctr., Inc.*, 726 S.W.2d 902, 904 (Tenn. 1987). Generally, trial courts must give the proponent of a motion to amend a full chance to be heard on the motion and must consider the motion in light of the amendment policy embodied in Rule 15.01 of the Tennessee Rules of Civil Procedure that amendments must be freely allowed; and, in the event the motion to amend is denied, the trial court must give a reasoned explanation for its action. *Henderson v. Bush Bros. & Co.*, 868 S.W.2d 236, 238 (Tenn. Workers' Comp. Panel 1993). Although permission to amend should be liberally granted, the decision "will not be reversed unless abuse of discretion has been shown." *Welch v. Thuan*, 882 S.W.2d 792, 793 (Tenn. Ct. App. 1994). Factors the trial court should consider when deciding whether to allow amendments include "[u]ndue delay in filing; lack of notice to the opposing party; bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979).

*Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 374 (Tenn. 2007).

In the case now before us, the Trial Court did carefully consider Plaintiff's motion to amend and specifically found that "there are no new claims Plaintiff seeks to assert which were not known or should have been known at least by the time of the filing of the Second Amended Complaint in District Court." The Trial Court further found that the District Court had entered a Scheduling Order, which "required an amendment deadline of

May 30, 2008," and that Plaintiff had attempted to file an amendment in District Court and had subsequently withdrawn that amendment. Further, after reviewing the proposed Third Amended Complaint the Trial Court found the proposed amendment "to be futile, untimely and would be prejudicial at this late stage of the proceedings." After carefully and thoroughly reviewing the record on appeal, we find no abuse of discretion in the Trial Court's denial of Plaintiff's last motion to amend.

As for Plaintiff's motion to conduct further discovery prior to responding to the motions for summary judgment, the Trial Court found that it was "unpersuaded to allow further discovery." For the reasons discussed above with regard to the grant of summary judgment and the findings of undisputed material facts, we agree with the Trial Court's determination that further discovery was unnecessary, at best. As such, we find no error in the Trial Court's denial of Plaintiff's motion to conduct further discovery prior to responding to the motions for summary judgment.

Next we consider whether the Trial Court erred in excluding at trial Plaintiff's claims concerning the administrative hearing. This administrative hearing was a post-suspension hearing with regard to the Incident, the investigation of the Incident, and Plaintiff's suspension. In essence, by raising this issue Plaintiff is attempting once again to re-argue the underlying facts concerning the Incident, the investigation of the Incident, and Plaintiff's suspension. As discussed above, the District Court found facts concerning the Incident, the investigation of the Incident, and Plaintiff's suspension, and these findings were affirmed by the Sixth Circuit. These findings constitute the law of the case. The Trial Court did not err in excluding at trial Plaintiff's claims about the administrative hearing. This issue is without merit.

Finally, we consider whether the Trial Court erred in finding and holding that Plaintiff failed to prove at trial his claim of intentional interference with business relations. With regard to this issue, our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Discussing the tort of intentional interference with business relationships, our Supreme Court explained that:

> liability should be imposed on the interfering party provided that the plaintiff can demonstrate the following: (1) an existing business relationship with

specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (citation omitted) (footnotes omitted).

With regard to this issue the Trial Court specifically found and held:

At trial, the Plaintiff failed to prove any of the requisite elements. The evidence offered by Plaintiff failed to identify a specific class of third parties with which the Defendants improperly interfered. The testimony of Dr. Stratienko and the cross examination of several witnesses who were physicians, demonstrated, at times, other doctors would longitudinally observe Dr. Stratienko's patients, or in his view, impermissibly interfere with his continued dealings with these patients. This testimony, however, does little to establish any of the elements required to prove his case. Contrasting this, evidence also established that patients often change doctors, sometimes frequently for various reasons. The Plaintiff provided no reason for these transfers or longitudinal observations and Plaintiff failed to demonstrate anything improper or impermissible occurred to entice the patients away from Dr. Stratienko.

The two largest failures of the Plaintiff's proof concern the improper means or motive element and the damage element. Under the improper means and motive, Tennessee law requires that the predominant purpose of the defendants' conduct must be to injure the plaintiff. Dr. Stratienko and Dr. Dan Fisher testified that they had a "gentlemen's agreement" not to deal with the other's patients. The letters entered as exhibits demonstrate that Dr. Fisher did not always strictly adhere to this agreement. *See* Exhibits 1-6. Those letters do not demonstrate an improper means or motive on the part of Dr. Fisher or intent to injure the Plaintiff. The case of *Trau-Med* cites several examples of "improper interference" including:

Those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules, violence, threats or intimidation, bribery, unfounded

litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship, and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct such as sharp dealing, overreaching, or unfair competition.

*See Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (*internal citations omitted*). Plaintiff provided no evidence which would rise to the level of improper means or motive; at most, the evidence indicated an overlap in the physicians' desires for patient business.

Even an [sic] assuming, *arguendo*, that Plaintiff had established the first four elements, there was no proof of damage. Dr. Stratienko attempted to state that he lost business because of the actions of other doctors. On cross-examination, however, it was shown that his business had actually performed better financially, in some instances, than previously before.

\* \* \*

Dr. Stratienko claims that his business relationships were harmed by the actions of the Defendants, yet his annual income failed to prove so. Further troubling to this Court, is the deposition testimony of Mr. Hutchison [sic], the Plaintiff's financial damages expert. His analysis concludes that Dr. Stratienko suffered approximately $250,000.00 in damage, but he failed to consider how many procedures Dr. Stratienko performed in any of the given years analyzed. It is illogical to argue an individual has been financially harmed, when that individual generates revenue based on the number of procedures they perform, without actually reviewing the number of procedures conducted in any given year.

The Plaintiff has failed to prove his case, and accordingly judgment is entered in favor of the Defendants.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Trial Court's findings relative to this issue. In light of the Trial Court's findings, we affirm the Trial Court's decision that Plaintiff failed to prove his claim of intentional interference with business relations for those reasons stated by the Trial Court.

-16-

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Alexander A. Stratienko, M.D., and his surety.

_____
D. MICHAEL SWINEY, JUDGE